1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF OREGON

3

4   RICHARD LEE,                    )
                                    )
5                Petitioner,    )   CV No. 02-300-CL
                                    )
6           vs.                     )   October 30, 2008
                                    )
7   ROBERT LAMPERT,                 )   Portland, Oregon
                                    )
8                Respondent.    )

9

10

11          TRANSCRIPT OF EVIDENTIARY HEARING

12        BEFORE THE HONORABLE OWEN M. PANNER

13      UNITED STATES DISTRICT COURT SENIOR JUDGE

14

15

16   APPEARANCES:

17   FOR THE PETITIONER:        Stephen R. Sady
                                Lynn Deffebach
18

19   FOR THE RESPONDENT:        Jacqueline Sadker
                                Summer Gleason
20

21

22   COURT REPORTER:            Dennis R. Grube
                                1000 S.W. Third Avenue, Suite 301
23                              Portland, OR  97204
                                (503) 326-8180
24

25

1                    (October 30, 2008)

2

3               P R O C E E D I N G S

4

5          THE COURT:    Be seated.    Good morning.

6          MR. SADY:    Good morning, Your Honor.

7          THE COURT:    I want to get a listing of who's at

8     the table, if we may, from my left to my right.

9               Let's start with you, Mr. Sady, introducing

10    your people.

11         MR. SADY:    Thank you, Your Honor.    Lynn

12    Deffebach who is a staff research and writing attorney in

13    the Federal Public Defender's Office and is on my far

14    right.

15         THE COURT:    Deffebach?

16         MR. SADY:    D-e-f-f-e-b-a-c-h.

17         THE COURT:    Okay.

18         MR. SADY:    And the petitioner, Richard Lee, is

19    to my immediate right.

20         THE COURT:    All right.

21              For the respondent?

22         MS. SADKER:    Good morning, Your Honor.

23    Jacqueline Sadker for the respondents, and to my left is

24    Summer Gleason.

25         THE COURT:    Last name again?

1    MS. SADKER:   Gleason, G-l-e-a-s-o-n.

2    THE COURT:   I recall that there was also a

3    motion by you to admit another lawyer as attorney of

4    record?

5    MS. SADKER:   That's correct, Your Honor.  It was

6    Ms. Gleason.

7    THE COURT:   That's Ms. Gleason.  All right.  She

8    is so admitted.

9    There are a few preliminary matters that I

10   would like to take up.  There is petitioner's motion to

11   strike the polygraphic evidence first.  I'm going to deny

12   that -- or, pardon me, I'm going to grant that motion.

13   I reviewed the polygraphic evidence record.

14   I also have reviewed the complete trial record in this

15   case, and I do not feel that it is -- while it's legally

16   inadmissible in court, I don't think it's helpful to this

17   situation, so I will allow petitioner's motion to strike

18   that.

19   It's also respondent's motion to exclude

20   irrelevant, expert witness testimony.  I'm going to deny

21   that.  I think in the light of the evidence in this case,

22   as confusing as it is, where Matthew, the child victim,

23   repeatedly refers to different people; where the

24   interrogation took place by the police officers five to six

25   months after the incident happened, and where the confusion

1   by Matthew in both his direct testimony, and the difference

2   between that and the evidence that the police officers

3   would put on and the father is such that I think it's

4   entirely appropriate that an expert should have been

5   called.

6               So I will -- I will deny that motion.

7               All right.  Anything else to take up before

8   we start?

9               Mr. Sady, I have your excellent briefing in

10  this matter.  I'm sure that as both counsel realized after

11  you've done such extensive briefing, that there are a few

12  key issues in the case, so I may quickly interrupt both of

13  you to ask particular questions.

14              But I will permit you, Mr. Sady, if you've

15  had any brilliant thoughts in the last many nights that

16  you've been worrying about this case, to tell me about

17  those.

18              MR. SADY:   Your Honor, first, I would like the

19  Court to be aware that Dr. Bruck is available by telephone

20  to provide any gap that the Court might feel from the -- or

21  development that the Court might wish to have from her

22  report.

23              I believe that her report extensively

24  covered it and my planned direct examination would simply

25  be for her to be adopting it and --

```
 1            THE COURT:   Yes.  What I'm going to ask counsel
 2   for respondents, my proposal would be to get her on the
 3   record and have her verify that her report is accurate
 4   under the penalties of perjury, and submit her to
 5   cross-examination to the extent that you wish to
 6   cross-examine her.
 7            You certainly do not waive your contention
 8   that it's all irrelevant in the first place and your motion
 9   to strike was made for the record.
10            Does that sound satisfactory to the
11   respondents?
12            MS. GLEASON:   It does, Your Honor.
13            THE COURT:   All right.  Let's get her on the
14   record right now.
15            MR. SADY:   Thank you.  We provided the courtroom
16   deputy with her call-in number.
17            THE COURT:   Mark, I need her report, please, so
18   that I can --
19            THE CLERK:   Shall I place the call, Your Honor?
20            THE COURT:   Yes, place the call.
21            MR. SADY:   We have an extra copy for the Court.
22            THE COURT:   I have one here.  Thank you.
23            (Courtroom deputy placing call)
24            THE CLERK:   Dr. Bruck?
25            THE WITNESS:   Yes.
```

1           THE CLERK:    Thank you.

2           THE COURT:    I'm going to ask you to raise your

3  right hand and be sworn, Dr. Bruck, if you will.

4

5                MAGGIE BRUCK, Petitioner's witness,

6                           duly sworn.

7

8           THE COURT:    Dr. Bruck, this is Judge Panner in

9  court.   I have your statement submitted in this case, dated

10  September 15th, 2008, and signed Maggie Bruck.

11                Is that the correct statement that you made

12  in this case?

13           THE WITNESS:    Yes, it is.

14           THE COURT:    And under oath do you swear that

15  everything in there is accurate and true?

16           THE WITNESS:    Yes.

17           THE COURT:    We are going to treat that as your

18  direct testimony in this matter and you will now be

19  submitted to cross-examination.

20                Let me back up a minute.

21                Mr. Sady, are there any corrections you want

22  to make or any other things you want to say with respect to

23  the direct testimony?

24           MR. SADY:    Thank you, Your Honor.   I believe

25  that any material that --

1          THE WITNESS:    Can I just interrupt for a minute?

2          THE COURT:    Yes.

3          THE WITNESS:    You know, when I was given the

4    oath, that was very clear.  I can hear you but if you could

5    get the speaker closer to you, it would make it easier, if

6    not, I'll just have to pay more attention.

7          THE COURT:    We will do that.  And you interrupt

8    any time.  Is that better now?

9          THE WITNESS:    Much better.

10         THE COURT:    Now, Mr. Sady, you need to have your

11   microphone close to you, also.

12         MS. SADKER:    With the Court's permission, I'll

13   sit down so I can be closer to the microphone when I'm

14   speaking.

15         THE COURT:    You may.

16         MR. SADY:    Thank you.

17         THE COURT:    Can you hear Mr. Sady?

18         THE WITNESS:    Yes, I can.

19         THE COURT:    All right.  At any time you can't

20   hear somebody, just tell me.

21         THE WITNESS:    Okay.

22         MR. SADY:    Your Honor, there may be some

23   material based on some of the more recent submissions that

24   I would go into, but I believe that that would be

25   appropriate probably for redirect.

1              THE COURT:   Very well.  All right.

2                    Ms. Gleason, do you have any questions of

3    the doctor?

4              MS. GLEASON:   I do.   Thank you.

5                        CROSS-EXAMINATION

6

7    BY MS. GLEASON:

8    Q.   Dr. Bruck, can you hear me all right?

9    A.   Yes, I can.

10   Q.   Dr. Bruck, is my understanding correct that you are a

11   professor and a researcher?

12   A.   Yes, that is correct.

13   Q.   Okay.  And with regard to forensic interviews of

14   children, is it my understanding that you do not conduct

15   them yourself?

16   A.   No.  I do not conduct them.  I evaluate them.

17   Q.   Okay.  And have you had any formal training in the

18   practices of forensically interviewing children who have --

19   who are suspected or confirmed sexual abuse?

20   A.   I provided some of the training.  I have not -- I have

21   sat in on some workshops.  But I do not -- I do not

22   interview children.

23   Q.   Is my understanding correct, and please feel free to

24   correct me if I'm wrong --

25   A.   Uh-huh.

1   Q.    -- that essentially you have reviewed other people's

2   research projects and have extrapolated your opinions based

3   on that, is that your primary work in this area?

4   A.    Not exactly.

5   Q.    Okay.  What --

6   A.    May I clarify?

7   Q.    Please.

8   A.    Well, I mean, I -- my -- my major role in this area

9   has been to conduct research on ways of looking at forensic

10  interviews, and it also has been to write reviews of

11  literature, as you mentioned, based upon my work, PCC's

12  work and other people's work.

13              My second role has been in the forensic

14  arena.  Has been to evaluate the interviews and other data

15  that have been collected to evaluate the nature of the

16  disclosure and the reliability of the disclosure.

17              So it's -- it's an evaluation -- it's an

18  evaluation role of what has already been done.  But I don't

19  do the major -- the first set of collection of data in the

20  forensic arena.

21  Q.    Thank you.  And did the petitioner's attorneys send

22  you some documents?

23  A.    Yes, they did.

24  Q.    Okay.  And in -- were those the documents that were

25  attached to a letter dated August 13th of 2008?

1   A.   I have it in front of me and I think it is, yes.

2   Q.   And in that letter they listed the documents that they

3   had provided you; is that correct?

4   A.   Right.  That's the letter.  Yes.

5   Q.   And have you reviewed any other documents than the

6   documents contained in that letter?

7   A.   I received some in the last day or so.

8   Q.   And what were those?

9   A.   And there were affidavits.  Affidavits.  One from the

10  child complainant who's now an adult, and one from Cheryll,

11  I forget her last name.

12  Q.   Do you believe that be Cheryll Lewis, formerly

13  Sullivan?

14  A.   Yes, that's correct.  So, I -- those are the documents

15  that I was given.

16  Q.   Okay.  Anything other than those?

17  A.   No.

18  Q.   And is it correct that you are being paid $375 an hour

19  to review the records, to write your declaration and

20  testify here today?

21  A.   That's correct.

22  Q.   What do you anticipate in total for your work on this

23  case?

24  A.   Between 6 and $7,000.

25  Q.   You also indicated in your declaration, and I believe

1    in your CV, that you have testified in a good number of

2    cases over the years.  In what percent of those cases have

3    you testified on behalf of an accused or a convicted sex

4    offender?

5    A.    Well, most -- most of the cases there has been no

6    conviction.  I mean --

7    Q.    That would be an accused sex offender then?

8    A.    Accused.

9    Q.    I will include those.

10   A.    Most of my work involved working for the defense, but

11   I have done a few cases for the prosecution.

12   Q.    Okay.  And what percent of your work is done for the

13   defense?

14   A.    Most of it.

15   Q.    In your research, isn't it true that children normally

16   report abuse of all kinds to a parent or a trusted adult?

17   A.    You know, that sounds familiar to me.  Probably,

18   depending upon the age of the child.  Young children,

19   probably, yes.

20   Q.    Well, isn't it true that children normally report to a

21   parent, a babysitter, a person at school such as a teacher

22   or a counselor?

23           THE COURT:    You know, Ms. Gleason, I don't want

24   to interrupt you, but we're not trying this case now at

25   all.  So, much of the detail that you are asking about

1  would be perfectly proper in the trial of the case, but

2  that's not what we're doing now, so I don't want to get

3  into that much detail. So let's stay on your examination

4  of her with the issues that are involved in this case.

5          MS. GLEASON: Your Honor, if I may? I do

6  believe that her understanding of how children report and

7  who they report to is directly related to this.

8          Dr. Bruck has taken issue with the fact that

9  this child reported to his father -- his father and to

10  Cheryll Lee, and I'm just trying to ascertain her

11  understanding and her experience with how children do

12  report and to whom they do report as a direct attack on

13  whether or not her opinion is reliable.

14          THE COURT: I think, again, that would be

15  appropriate if we were trying this case and she were on the

16  witness stand. That is not what we're doing. We're trying

17  to determine now whether that expert evidence should have

18  been received in this case and -- or any other expert

19  should have been recalled in this case.

20          MS. GLEASON: Okay. I'm sorry, and perhaps I'm

21  under a misunderstanding. I thought the issue today was

22  whether or not petitioner was actually innocent as a

23  gateway to get to the procedurally defaulted --

24          THE COURT: That's absolutely true. You have

25  that right. But that isn't necessarily tied to the details

1  of this expert's opinion.  That's involved with a lot of

2  other things.  And the gateway, it's true, is whether or

3  not an expert should have been called, and that's what I'm

4  trying to get at.  We need to talk about whether an expert

5  should have been involved in this case, not what her

6  particular experience is or otherwise.

7           MS. GLEASON:   Well, I understood whether or

8  not -- and I'm sorry, Your Honor, and perhaps --

9           THE COURT:   Well, that's all right.

10          MS. GLEASON:   -- it's my lack of understanding.

11  I want to be clear because I want to understand what you

12  want.

13          THE COURT:   Yes.

14          MS. GLEASON:   I understand that whether or not

15  an expert should have been called goes towards the merits

16  of petitioner's ineffective assistance of counsel claim.

17          THE COURT:   That's correct.

18          MS. GLEASON:   And that you could only get to

19  that claim if petitioner proves that he is actually

20  innocent -- that no reasonable juror would have found him

21  guilty.

22          THE COURT:   That's correct.

23          MS. GLEASON:   And what I'm attempting to do,

24  Your Honor, is to show that if they would have called

25  Dr. Bruck, that the impact of her testimony would not

1    indeed show that no reasonable juror would have found

2    Mr. --

3              THE COURT:    I think that's where we get off the

4    track.    The question is not whether Dr. Bruck would have

5    been able to establish the innocence but whether that

6    expert testimony should have been given in this case.

7              So, I think you've got it pretty well right,

8    but I'm just not prepared to go into the details of what

9    she would have done or what she learned in this particular

10   case as distinguished from what any child expert would have

11   developed.    You can ask her questions considering those

12   issues.

13             MS. GLEASON:    I had things -- just to be clear,

14   I want to make sure.    I had planned to ask her questions

15   regarding some assumptions that she's made in her report

16   that go directly to her opinion, her underlying opinion of

17   this case.    And I would like the opportunity also because I

18   believe it goes to the weight of her opinion.

19             THE COURT:    You can ask a few questions.    Let's

20   try to make it as brief as possible.

21             MS. GLEASON:    Okay.    I will.    Thank you, Your

22   Honor.    (Pause)

23                  May I have a moment, Your Honor?

24             THE COURT:    Sure.

25   BY MS. GLEASON:

1 | Q.   Dr. Bruck --

2 | A.   Yes.

3 | Q.   -- in the materials you received, did you receive

4 | information that petitioner is alleging that his brother

5 | Larry Lee looks remarkably like him and does not have

6 | tattoos?

7 | A.   Well, I -- my understanding was that this was a

8 | strategy that was used at trial.

9 | Q.   Okay.  So you have not received -- well, let me ask

10 | you this:  Did you take into consideration in rendering

11 | your opinion the -- any evidence regarding Larry Lee and

12 | his tattoos?

13 | THE COURT:   Once again, we're getting to the

14 | details of what she might have decided as distinguished

15 | from whether or not an expert's testimony should have been

16 | given in this case.  And we could spend a whole day on her

17 | opinion and cross-examining and recross examining, but the

18 | issue is, should an expert have been called in the case.

19 | MS. GLEASON:   Thank you, Your Honor.

20 | BY MS. GLEASON:

21 | Q.   Dr. Bruck, in page 2 of your report you write the

22 | suggestive interviews with eliciting false information; is

23 | that correct?

24 | A.   That's -- I'm looking at page 2.  I'm not sure on

25 | that.  I think I have a different page.  Can you read the

1    paragraph it starts with?

2    Q.    Sure.

3    A.    "Suggested Interview Techniques?

4    Q.    It would be paragraph b.

5    A.    I beg your pardon?

6    Q.    It's paragraph b, small b, "Suggestive Interviewing

7    Techniques" is the heading.

8    A.    Okay.  I have read it, yes.

9    Q.    Is that a fair statement of your beliefs?

10   A.    That suggested interview techniques raise the risk of

11   eliciting false reports?

12   Q.    Yes.

13   A.    Yes, it is.

14   Q.    In general, based on your research, are young children

15   capable of making reliable statements regarding sexual

16   abuse?

17   A.    Yes.

18   Q.    And would a five-year-old be capable of accurately

19   reporting an incident of sexual abuse?

20   A.    Yes.

21   Q.    And are all instances of use of anatomically correct

22   dolls suggestive in and of themselves?

23   A.    Yes.

24   Q.    Is there not literature that would disagree with that?

25   A.    Yes, there is, but it's not very convincing.

1   Q.   In your opinion --

2   A.   And it's -- it's usually with an older age group.

3   Q.   Okay.  Are you aware of an article --

4           THE COURT:   Let's cut this short.

5           Tell us, Dr. Bruck, why you believe an

6   expert should have been called in this case.

7           THE WITNESS:   Okay.  Well, I think that --

8   first -- first of all, the expert would have been able to

9   frame the case in a way for one to be able to examine the

10  reliability of the evidence.  That is, how trustworthy the

11  evidence is.  Of particular concern, there are several

12  particular concerns in this case and they all differ.

13          But one has to do with the chronology of

14  events, which are absolutely crucial to making --

15  becoming -- for anyone to come to a determination about

16  this case.  And there certainly is a whole issue that this

17  child had already in detail without any prompting made a

18  disclosure of the view.

19          The second part -- and that's really

20  important in trying to figure out what goes on after that

21  or what affect that might have on any kinds of later

22  disclosure.

23          The other thing that everyone always looks

24  at as an expert in this case has to do with timing.  That

25  is the period in between.  Because it tells us something

1  about the degree to which the child may be available to be
2  tainted.

3                    And what's crucial is the fact that there
4  are -- if one sees a long lag between the time that a child
5  tells an adult, and that child is then interviewed by a
6  forensic or an official investigator, and that's what
7  becomes the record.

8                    And when there are very long periods of
9  time, experts -- this is something that the expert just
10  knows what to ask and to bring up and then to say this is
11  really a problem, and I'm not sure that that could have
12  ever gotten there without an expert.

13                    The second thing is, and I'm just thinking
14  about what -- about this one case, is the whole issue with
15  the doll.  Now, at the time that this case got tried there
16  was, in fact, some literature already out there in which
17  there was -- was suspicious problems with the use of the
18  dolls.

19                    And what an expert would have pointed out
20  are several things.  The first thing is why were the dolls
21  used in this case.  There was no necessity to do that given
22  the previous interview.

23                    The second part is that that interview
24  itself, given the fact that the dolls were there, really
25  compromise our understanding of what that child was trying

1   to say.  It was a very complicated task from what we can

2   imagine in that we think that there were three dolls there;

3   that the child was asked a whole bunch of questions about

4   one person, another person, two people together.

5           And someone who's an expert in child

6   development understands children's notions of symbolic --

7   of -- of -- of what the dolls were meant to represent and

8   how they were introduced.  An expert certainly would have

9   brought that out since that was really the major evidence

10  that was in this trial.

11          And the fourth thing, and then I can talk --

12  most of this is in my report, but the other thing that an

13  expert would have done is that they would have looked at

14  the fact that the only time we ever hear the child's voice

15  is in that courtroom.

16          And all the factors that could distort:  The

17  parents' report, the babysitter's report and the police's

18  report.  Not consciously, these are just normal factors

19  that distort normal memory.  And so that -- that speaks to

20  really what we -- how accurate is the background

21  information that we're getting in order to even start to

22  make these judgments of is this guy guilty or not.

23          And what the expert would have done is, in

24  fact, reviewed the quality of the evidence that the jury

25  has to deal with.  And at that point it's the jury's duty,

1 │ of course, if they wanted to, is to say listen, you know, I

2 │ don't care what the expert says, this child was believable.

3 │ Whatever.

4 │ But it's also possible that the jury would

5 │ have said, you know, this -- how good is the information

6 │ we're being given in order to make this determination.

7 │ It's not very good, according to your expert.  We have

8 │ severe doubt.

9 │ So that's what an expert could have done.

10 │ And how successful they would have been, I mean, I can't

11 │ tell you.  But that's generally what happens in these

12 │ cases, is that don't really talk very much about the child,

13 │ but about how that information was -- was retrieved and

14 │ what the jury is being presented with.

15 │ THE COURT:    All right.  Any further questions?

16 │ THE WITNESS:    Do you want me to continue?

17 │ THE COURT:    No.  No.  Unless you have something

18 │ else in response to an answer to my question.  If you do,

19 │ you can continue, otherwise --

20 │ THE WITNESS:    That's it.

21 │ THE COURT:    Any further questions of this

22 │ witness?

23 │ MS. GLEASON:    I do.

24 │ BY MS. GLEASON:

25 │ Q.    Dr. Bruck, isn't it true at the time of this trial

1    that most of the literature in this area supported the use

2    of anatomical dolls.

3    A.    I don't think -- I don't think it supported it.    I

4    think that a lot of people used it.    But the point is that,

5    you know, you do certain kinds of tests that you later

6    found out to be bad.    You don't -- I mean, it's not -- it

7    wasn't malevolent, malicious, it was just -- I mean, we

8    just found out that it was wrong.

9    Q.    And didn't that occur after the time of this trial?

10   A.    That we found out it was wrong?

11   Q.    Yes.

12   A.    You know, by -- I -- I -- by 1994 there was a lot of

13   literature out there that suggested that the dolls were not

14   a good vehicle.

15   Q.    But there was still literature out there that

16   suggested they were, so at best it was a mixed picture in

17   1994?

18         THE COURT:    Well, I think, once again, we're

19   getting away from the issue that should an expert have been

20   called in this case.    And maybe that's a matter of argument

21   later, but I -- as far as your questions to this witness,

22   tailor them to determining why an expert should have been

23   called or should not have been called in this case.

24   BY MS. GLEASON:

25   Q.    Dr. Bruck, in your research --

1          Well, let me ask you this:  Would an expert

2    have been able to testify at trial that suggestive

3    interviewing always elicited false reports of sexual abuse?

4    A.    I don't think any expert would ever testify to that.

5    Q.    Okay.  And wouldn't an expert have been required to

6    agree that suggestive-- that a child's susceptibility to

7    suggestive interviewing techniques depends on factors

8    related to the interview and intrinsic factors related to

9    the child?

10   A.    Not necessarily.

11   Q.    Okay.  You --

12   A.    In fact, no.

13   Q.    So -- I guess I don't understand your response to this

14   one based on the third one, but I'll move on.

15          Isn't it true that Matthew's statements are

16   only unreliable if he was affected by the suggestive

17   interviewing?

18   A.    No.  That's -- that's -- that's an incorrect --

19   that's -- that's incorrect.

20   Q.    Well, if a child is -- you said earlier that a child

21   who is subjected to suggestive interviewing is not always

22   affected by them?

23   A.    That's correct.

24   Q.    And so in order for Matthew's statements to be

25   unreliable, or his statements to be believed untrue, he

1  would have had to have been affected by the suggestive
2  interview, would he not have?

3  A.    No, that's not correct.  No.  It's the suggestive
4  interviewing that renders the evidence unreliable.  It is
5  possible that Matthew, in fact, might have been immune from
6  those suggestions, or it could have been that the
7  interviewer was lucky and guessed the right suggestion.

8              But it's -- it's almost like -- it's almost
9  like saying well, you know what, I picked the gun up and I
10  forgot to put it right in the bag, and it sort of laid
11  around the room for a while, but no one came in, and I
12  think it's okay, and therefore should be admitted as
13  evidence.

14             I mean, you don't know.  I mean, that's what
15  the problem with these cases is, we don't know.  The only
16  thing we know is what happened to the chain of evidence,
17  how has that evidence been collected.

18             And so by saying it's unreliable, what it's
19  telling the jury is, you know, treat this with a lot of
20  care because it -- it may not be informative at all.

21             And in our -- our research in the -- in
22  laboratory, we do know what's accurate and not accurate.
23  We have that advantage.  And -- and because of that we know
24  that if we use certain techniques you are going to elicit
25  false reports.

1         So we can say that the use of these

2    techniques, in fact, have a high risk of eliciting false

3    report.  But in the real world, such as in the case we're

4    dealing with, we don't know what happened to Matthew.  We

5    don't know what happened to him in terms of sexual abuse.

6    What we do know what happened is in terms of how he was

7    treated up to and through the trial.  And that's what we

8    have to pay attention to in terms of evaluating his

9    statements.

10         And the fact of the matter is that there was

11   suggestion, there was delay, there were improper

12   techniques, and that is what has to go into what an expert

13   would talk about, and what the jury would then have to make

14   their decision or -- or consider the degree to which that

15   was important for them to make their decision.

16         But it had nothing to do with Matthew's

17   accuracy or inaccuracy.

18   Q.   And ultimately that would be what the expert would

19   have to say if we truly don't know whether or not Matthew

20   is telling the truth or not, we only can say that we

21   believe the techniques used have a high road of eliciting

22   unreliable information?

23   A.   That's what experts say.

24   Q.   And you, after reviewing the record, cannot tell

25   whether or not Matthew was telling the truth in this case?

1   A.    I have no idea.

2   Q.    And you have no way of knowing whether or not Matthew

3   was sexually abused by Richard Lee?

4   A.    Well, that -- I mean, as an expert that is not my --

5   that is not my role to make those judgments.

6   Q.    And you have no way of telling whether or not Richard

7   Lee is actually innocent of sexually abusing Matthew

8   Hendricks, do you?

9   A.    I don't.   That's not what my role is.   That's the

10  role of -- that's making credibility judgments.   That's not

11  the role of an expert.

12  Q.    And in providing testimony, would an expert make some

13  assumptions like you did about the motivation and the

14  actions of the witnesses?

15  A.    Yes.

16  Q.    And were the assumptions you made about Daniel

17  Hendricks, Matthew's father, based on any factual

18  information in the report or were you speculating about the

19  motives?

20         THE COURT:   Once again, we're getting into too

21  much detail.   Let's -- any further questions you have of

22  this witness?

23         MS. GLEASON:   No.

24         THE COURT:   Any further questions, Mr. Sady?

25         MR. SADY:   Yes.   I have one minor clarification

1    on the --

2              THE COURT:    All right.

3              MR. SADY:    -- first question that you had

4    about -- elicited regarding terminology.    If I could just

5    clarify that one point?

6              THE COURT:    You may.

7

8                     REDIRECT EXAMINATION

9

10   BY MR. SADY:

11   Q.    Dr. Bruck, when you at the outset were talking about

12   the importance of chronology and referring to an extensive

13   report that was provided, that was referring to Exhibit Q,

14   which is the extensive information provided regarding abuse

15   regarding -- from Robert Nachand, and that report was

16   provided on March 14th, 1994?

17   A.    That was part of it.    But there were other -- there

18   are other parts of the chronology also that are important

19   in this case.

20   Q.    Yes.    But the starting point was --

21   A.    That's the starting point.

22   Q.    And the important part of that report included the

23   statement that Matthew did not disclose any other abuse?

24   A.    That's correct.

25             MR. SADY:    Nothing further, Your Honor.

```
 1              THE COURT:    All right.    Any other witnesses for
 2   the petitioner?
 3              MR. SADY:    No, Your Honor.
 4              THE COURT:    Any witnesses for the respondent?
 5              MS. SADKER:    No, Your Honor.
 6              THE COURT:    All right.    We're ready for
 7   argument.
 8              And, Mr. Sady, I will give you the first
 9   opportunity, keeping in mind what I said earlier, and that
10   is I may interrupt you regularly with questions, as I will
11   other counsel.
12              THE WITNESS:    Excuse me, Your Honor.    Should I
13   stay on the line?
14              THE COURT:    Oh, I'm awfully sorry, Doctor.
15   You're excused and thank you very much.
16              THE WITNESS:    Okay.    Thank you.    Bye.
17              THE COURT:    All right.
18              MR. SADY:    Your Honor, the question before the
19   Court, and I think this segues into the last questions
20   directed to the expert are critical.
21              We are talking here about the reliability of
22   the testimony and whether the reliability is of a
23   sufficient grade that we can have sufficient confidence
24   that a conviction obtained with constitutionally defective
25   procedure should be immune from review.
```

1          And we have easily passed that bar, I
2   believe, simply based on the testimony of the expert.
3          THE COURT:   You have to have two new or three
4   new factual matters to present before you can get out from
5   under the default.
6          MR. SADY:   That is correct, but --
7          THE COURT:   All right.   What are those events?
8   What facts do you think were not shown that's new factual
9   evidence in this case?
10         MR. SADY:   Well, first, related to the expert
11  testimony, the reliability factors about how suggestive and
12  improper that procedure was and how likely that was to
13  elicit defective information.   The information regarding
14  the significance of the first report, the first report
15  being the most reliable report --
16         THE COURT:   And there was no expert on either
17  side; do I understand that?
18         MR. SADY:   That is correct.   Although, I must
19  comment that Officer Fowler's testimony looked an awful lot
20  like he's trying to put on the coat of an expert.
21         THE COURT:   Yes.   I should have said "no
22  qualified expert."
23         MR. SADY:   Yes.   Especially somebody who's
24  saying he's making it up as he's going along in terms of
25  interrogation.

```
 1              THE COURT:   What's another new factual matter?
 2              MR. SADY:    The impropriety of having videotape
 3   of the -- of the proceedings.  You'll recall --
 4              THE COURT:   Well, that came into evidence,
 5   didn't it?
 6              MR. SADY:    No, there wasn't --
 7              THE COURT:   It came in evidence that there was
 8   none.
 9              MR. SADY:    Right, but there was no -- it was
10   presented by Officer Fowler as this is a discouraged
11   practice.  Well, the discouraged practice was one that
12   interfered with the ability to determine reliability, and
13   that's what an expert would have been able to do in terms
14   of knocking down that phony --
15              THE COURT:   Well, accepting -- let's go to
16   another subject.
17              MR. SADY:    Yes.
18              THE COURT:   Let's accept for the moment that
19   calling an expert is a factual matter that should have been
20   done in the trial.
21              MR. SADY:    Yes.
22              THE COURT:   What other new factual matters are
23   there, if any?
24              MR. SADY:    There is the additional information
25   regarding the brother, and that has been presented through
```

1  the photographs, the statements of Cheryll Lee at the time,

2  that he was in the presence of the child, that he was at

3  least on one occasion wrestling with the child, and they're

4  very similar facial characteristics.  That was a factor.

5           And in terms of looking at what factors need

6  to be looked at for a -- to get through the Schlup gateway,

7  the key element, I believe, is the totality of the

8  circumstances that House has used because what we're

9  looking at in the case is --

10           THE COURT:   Let's just stick with any other new

11  factual matters.  I'm particularly concerned about the 412

12  motion that was denied.

13           MR. SADY:   Yes.

14           THE COURT:   It seems to me that certain facts

15  that would have developed about other abusers were

16  deprived, were denied in this case, and that concerns me.

17           MR. SADY:   And I'm looking for the exhibit

18  number of the Nachand material.  I think that that was

19  very, very important material to show --

20           THE COURT:   Well, just tell me about it without

21  looking at papers.  I mean, you're an experienced,

22  competent lawyer.  The defendant in the trial made a 412

23  motion to have Nachand's activities with the child received

24  in evidence.  That was denied.

25           MR. SADY:   Yes.

1            THE COURT:   Granted later.  At the end of the

2   case Nachand's criminal record and his conviction were put

3   in evidence, but there never was put in evidence anything

4   that he actually committed sodomy on the child at about the

5   same time.

6            MR. SADY:   And I think what's critical is that

7   the description in the report matches the type of

8   description that ends up with the anatomical doll that ends

9   up --

10            THE COURT:   So -- so without arguing it, I'm

11   trying to just get you to isolate whatever new evidence you

12   think justifies meeting the Schlup gateway.

13         .   MR. SADY:   I believe the constellation of

14   reliability factors around the expert is one.  Two, the

15   number of reports regarding the other person with a very

16   similar appearance who was in contact with the child and

17   who at least Cheryll Lee says wrestled on at least one

18   occasion with the child.

19                  And third, the extensive evidence regarding

20   the background of Mr. Nachand, the debriefings of him and

21   the similarities and how those factors could have been --

22   would have been absolutely critical to open on, to use in

23   cross-examination, to be -- that was the case.  It -- they

24   basically didn't have a theory of the case.  At the very

25   end of the case when the Government decides that it's

 1    tactically advantageous for them to put it in --

 2            THE COURT:   Or it might have been error it

 3    didn't.

 4            MR. SADY:   And at that point, though, the train

 5    had left the station.   They were -- had not -- had not

 6    received an expert, the expert, of course, and this is

 7    where the totality and the synthesis of the -- of the

 8    defect in this case comes through which is how an expert

 9    would have been put on if they had been able to put on

10    their case to show how hugely prejudicial it is when you

11    have somebody who's already been the victim -- victimized

12    the child, who's already admitting that there was improper

13    conduct that occurred, that is describing the same type

14    that -- in the debrief with the child, describing the same

15    types of activities that months later are all of a sudden

16    attributed to somebody else at the behest, at the

17    suggestion, initial suggestion of somebody else, of the

18    father, of a father who coincidentally --

19            THE COURT:   All right.

20            MR. SADY:    -- and this is a new fact.

21            THE COURT:   Before you argue further on that,

22    I'm going to move to the respondent.   I want the respondent

23    to tell me what their argument is about the three issues

24    that I see in this case that could be new evidence to

25    justify getting through the narrow Schlup gateway.   And

 1    those three have been partially outlined by petitioner's

 2    counsel, but I'm particularly concerned about the evidence

 3    that was precluded that another person committed sodomy on

 4    this defendant at about the same time that this happened.

 5              So isn't that new factual evidence that was

 6    kept out of the trial?

 7              MS. SADKER:   Your Honor, I believe that that

 8    evidence came into the trial --

 9              THE COURT:   Tell me precisely by transcript page

10    and number where that came in.   The only -- I've studied

11    the transcript.   The only thing I remember is that there

12    was some general questions and ultimately the criminal

13    conviction was received at the end of the trial about this

14    third party.

15              MS. SADKER:   If you'll just give me a moment,

16    Your Honor.

17              THE COURT:   Let me see the transcript, Mark.

18    You find this for me once she mentions it and I'll --

19              MS. SADKER:   I believe that's transcript page

20    140 to 141.

21              THE COURT:   All right.  Read me that part.

22              MS. SADKER:   "Officer Fowler, just to clarify,

23                    Then, when you were using these dolls at the

24                    CSD office, there was another doll that was

25                    depicted as Robert; is that correct?

```
 1                    "Yes.

 2                    "And you asked the boy to demonstrate things

 3                    with the Robert doll as well as the Richard

 4                    doll; is that correct?

 5                    "Yes.

 6                    "And basically the child made the same types

 7                    of demonstrations with the Robert doll that

 8                    he made with the Richard doll; is that

 9                    correct?

10                    "Objection.

11                    "Overruled.

12                    "If, when you say 'the same type,' you were

13                    referring to inappropriate sexual contact,

14                    yes.   If you were referring to specific

15                    sexual acts, no.

16                    "Well, the demonstration with the Robert

17                    doll showed the adult having oral sex with

18                    the child doll?

19                    "Objection.

20                    "Overruled.

21                    "And it also -- he also showed the child

22                    doll having oral sex with the Robert doll;

23                    is that correct?

24                    "Fellatio, yes."

25             THE COURT:   Do you think that meets the standard
```

1    of evidence that was kept out that Robert actually had sex

2    with this child and that that was in fact an admitted

3    matter before the trial?  It never came in evidence.  What

4    you've read to me is what the child said being led by the

5    officers.

6                So my question is:  Is that the same as the

7    judge denying the 412 motion?

8                MS. SADKER:   I'm not sure I understand the

9    question.

10               THE COURT:   Well, the question is, if I

11   understand, it's pretty clear from the documents that were

12   made available that Robert had oral sex, sodomy with the

13   child during this same time period.

14               Is that correct?

15               MS. SADKER:   I believe so, Your Honor.

16               THE COURT:   All right.  Did that ever come out

17   from anybody's mouth other than by manipulating the dolls

18   around and leading a four-year-old at that time?

19               MS. SADKER:   In addition to the testimony

20   regarding demonstrating oral sodomy with the Richard and

21   Robert dolls, there was also the testimony of Daniel

22   Hendricks --

23               THE COURT:   Okay.

24               MS. SADKER:   -- in which he asked about the

25   conversation -- in which he was asked about the

1  conversation --

2           THE COURT:   What page?

3           MS. SADKER:   -- he had with Matthew when he--

4           THE COURT:   What page are you --

5           MS. SADKER:   -- said "was that oral sex" --

6           THE COURT:   Excuse me.   What page are you at?

7           MS. SADKER:   I'm sorry.   It's transcript 163.

8           THE COURT:   Go ahead.

9           MS. SADKER:   And trial counsel asked him:

10               "Was that oral sex that he did on

11               Mr. Nachand, Robert Nachand?

12               The answer was "Yes."

13               "And did he describe oral sex going in the

14               other direction?

15               "Yes, he did.

16               "Mr. Nachand on him?

17               "Yes, he did."

18           THE COURT:   Wait a minute.   This is the father

19  talking to the child?

20           MS. SADKER:   That's correct.

21           THE COURT:   And so you're saying that because

22  the child said that Robert had oral sex with him, that's a

23  disclosure of what actually happened?

24           MS. SADKER:   No.   I'm saying that because that

25  evidence was presented at trial it cannot qualify as new

1  evidence for purposes of <u>Schlup</u>.

2          THE COURT:   Okay.   Maybe I'm not understanding.

3  Reframe that for me.   What particular is it that you say

4  was the evidence that Robert had oral sex and committed

5  sodomy with Matthew?

6          MS. SADKER:   The testimony of the officer and

7  the testimony of the victim's father.

8          THE COURT:   Yes.

9          MS. SADKER:   There were two places in the

10 transcript that I'm aware that the jury was made that

11 Robert Nachand also had oral sex.

12         THE COURT:   Do you think that was believable to

13 the jury or even have any chance to be believed in light of

14 all the circumstances?

15         MS. SADKER:   Absolutely.   I don't know why it

16 wouldn't have been.

17         THE COURT:   Uh-huh.   What about the denial of

18 the 412 motion?   That was clearly error, wasn't it, aside

19 from anything else.

20         MS. SADKER:   If that was -- if that was error

21 under Oregon Rape Shield law, I believe that error didn't

22 have any prejudice because, as we just discussed, all the

23 evidence came in.

24         THE COURT:   Did all the evidence come in?   Was

25 the defendant entitled to put on evidence or talk on the

1  opening statement about the fact that Robert did have, not

2  maybe did because the father and the police officer said,

3  but that Robert did actually have oral sex and committed

4  sodomy with Matthew at about the same time?  Was that ever

5  in?

6        MS. SADKER:   You're correct, Your Honor, I don't

7  believe he was able to say that in his opening statement.

8  However, it came out at several other points in the trial.

9        THE COURT:   Was he ever able to argue --

10        MS. SADKER:   Yes --

11        THE COURT:   Wait a minute.  Was he ever able to

12  argue that absolutely there was no question, not hearsay

13  testimony, that Robert had oral sex with Matthew?

14        MS. SADKER:   Yes.  I believe that Robert's

15  conviction was admitted at the time.

16        THE COURT:   What did the conviction say?  It was

17  for sexual abuse, wasn't it, not sodomy?

18        MS. SADKER:   I don't have it in front of me.

19        THE COURT:   I can tell you it was for sexual

20  abuse, not sodomy.  However, before the conviction I

21  understand that he did admit sodomy with Matthew and

22  entered a plea to get off to 23 months for sexual abuse.

23              Is that correct?

24        MS. SADKER:   My recollection is that he never

25  actually admitted to sodomizing Matthew, but he did -- I

 1  believe he made no comment to that effect.  I can't recall,
 2  but he has vehemently maintained that he did not sodomize
 3  Matthew.

 4          THE COURT:  Yeah.  But he should have been
 5  cross-examined on it, shouldn't he, under this Rape Shield
 6  law?  In other words, the trial judge should have let that
 7  evidence come in directly that Robert did commit oral sex
 8  and sodomy with Matthew?

 9          MS. SADKER:  Based on everything that I have
10  seen he would have simply denied that in court had he been
11  presented --

12          THE COURT:  But he could have been
13  cross-examined about it.  And when we're talking about new
14  things, we're not talking about whether everything is
15  perfectly clear or not, are we?

16          Anyway, let's go to the other two.  We've
17  warn that one out.  Let's go to the other two.

18          MS. SADKER:  I'm sorry, what are the other two?

19          THE COURT:  The other two were Larry's
20  association and the expert's testimony.

21          MS. SADKER:  As far as Larry's association.
22  While there is some evidence that he was around at the
23  time, Cheryll Lee, the babysitter, has testified that she
24  never left the child in his care.  Additionally, the child
25  had testified as a result that he was not sexually abused

1   by this man.   If that's not enough, I think that the fact
2   that Larry actually doesn't have -- he has a tattoo on his
3   chest, which petitioner seems to make kind of a large deal
4   about the fact that when he was testifying at trial Matthew
5   said that he didn't see anything when asked about the
6   petitioner's chest.

7                   So Larry actually had a tattoo on his chest
8   where the petitioner does not.   So I believe the Larry
9   information is kind of uncompelling.

10                  THE COURT:   But you also have a letter from
11  Richard himself saying that Larry had nothing to do with
12  it?

13                  MS. SADKER:   That's correct.

14                  THE COURT:   So it was a little inconsistent at
15  times in that letter on a number of things by saying Robert
16  was in jail when all this happened when he wasn't.

17                  MS. SADKER:   Right.   It was a little -- it was
18  back and forth but I think he did say several times in that
19  letter I know you didn't do it.

20                  And then as far as the expert testimony, you
21  know, I have to respectfully disagree with you.   I don't
22  believe that the issue in this case is whether the expert
23  should have been called at the trial.   I believe that would
24  be the issue if we pass through the Schlup gateway, but I
25  don't think we've gotten there yet.

 1              I think the petition is untimely and I think

 2    his claims -- some of them were not presented to the state

 3    court.  Now, some of them were.  And we do have a state

 4    court decision on some of them.  And if that -- if that

 5    does become the issue, if we pass through the Schlup

 6    gateway, respondent would request the opportunity to brief

 7    these claims because --

 8              THE COURT:   What haven't you briefed?  You've

 9    briefed everything, haven't you, already?

10              MS. SADKER:   We focused on --

11              THE COURT:   How long is this going to go on?

12    This comes back from 1993 and 4.

13              MS. SADKER:   Yes, Your Honor.

14              THE COURT:   This man has practically served his

15    sentence.

16              MS. SADKER:   Yes, Your Honor, but --

17              THE COURT:   So I'm not going to delay this

18    matter any further.

19              MS. SADKER:   Well, we would just like to put on

20    the record that we would like more time to track down the

21    victim as well as respond to the expert's report.  We

22    received his report Friday at -- I believe 11:00 p.m.

23              So we really haven't had time to digest or

24    find another expert even though we know many are available

25    to would say the exact opposite everything that expert

 1  testified to, so if that becomes the issue we would like

 2  the opportunity for more time to present those things.

 3              One other additional evidence that they have

 4  put on, the new evidence, I think a couple of things need

 5  to be pointed out about the evidence in this case, the

 6  remarkable consistency of Cheryll Lee's testimony from 1994

 7  to today.  She left the victim alone with this man.  She

 8  didn't leave the victim alone with his brother.  She left

 9  him alone with him.  And Matthew --

10              THE COURT:  Cheryll's testimony was originally,

11  before all this got wound up, that the defendant Richard

12  said that he touched his peepee, right?

13              MS. SADKER:  That Richard said he was wrestling

14  with Matthew when confronted about --

15              THE COURT:  Yeah.  And Cheryll said that was

16  probably true.  This was way back in '93, wasn't it?

17              MS. SADKER:  I believe that's correct.

18              THE COURT:  Cheryll said that was probably true

19  because he did wrestle some with the kids.

20              MS. SADKER:  I don't recall that.  I would have

21  to review that again.  I don't remember --

22              THE COURT:  Maybe I just concluded that probably

23  was true because he shouldn't have been wrestling with kids

24  that age anyway but -- and there's not much question that

25  Cheryll never accused him of sodomy, did she?  Never

1    claimed that he, Richard committed sodomy?

2           MS. SADKER:   Well, she was not present at the

3    time, so she would have no knowledge of that.   And the

4    other --

5           THE COURT:   Well, she was there -- she said she

6    was there all the time except for three times when she went

7    to the store, and he was there about 20 minutes with Robert

8    also in the house.

9           MS. SADKER:   Potentially sleeping, yes.

10          THE COURT:   And some of the other children in

11   the house.

12          MS. SADKER:   I don't believe there's any

13   indication there were other children present at the time.

14          THE COURT:   Well, I'll look at the record on

15   that.

16          MS. SADKER:   And the other piece of consistent

17   evidence here is Matthew.   Matthew testified to these

18   events bravely at five years old and still remembers them

19   vividly to this day.

20          THE COURT:   When you say he testified to them

21   bravely --

22          MS. SADKER:   Yes.

23          THE COURT:   -- at five years old.

24          MS. SADKER:   Yes.

25          THE COURT:   He actually made it clear there was

1    no sodomy in his testimony, didn't he?

2            MS. SADKER:    Yes.    I believe that he was --

3    there were -- he was young, he was a child, so I believe

4    there were some confusing questions and answers in the

5    record that are difficult to ascertain on a transcript

6    page.    However, the jury had the opportunity to view his

7    testimony and found him to be credible.

8            THE COURT:    Well, yes, but what he said wasn't

9    any more than sexual abuse on the witness stand, wasn't it?

10            MS. SADKER:    I believe that's correct on the

11    witness stand.

12            THE COURT:    So let's accept his testimony.

13    Isn't that pretty strong indication that there wasn't

14    sodomy when you say Matthew was totally credible?

15            MS. SADKER:    I believe that he told other people

16    that there was sodomy.    The fact that he didn't --

17            THE COURT:    Yeah, he told the two police

18    officers five months later.

19            MS. SADKER:    Right.    And if -- I mean, he

20    remembers it to this day so we --

21            THE COURT:    Interestingly enough, after his

22    testimony at trial on the record when he was asked whether

23    it was Robert or Richard who sexually touched him, not

24    sodomy, sexually touched him, the prosecutor asked for a

25    recess, went out with the family and Matthew, and then came

 1  back and got Matthew to say it was Richard, right?

 2          MS. SADKER:   I don't believe he got Matthew to

 3  say it was Richard.  I believe he clarified his testimony

 4  on the stand that he --

 5          THE COURT:   Yeah.  First he said it was either

 6  Robert or Richard who touched him sexually.

 7          MS. SADKER:   I think the evidence indicates they

 8  both touched him sexually, so he said, "Robert, I mean

 9  Richard."

10          THE COURT:   Wait a minute.  I want to talk about

11  what Matthew said.  Matthew first said it was either

12  Richard or Robert that touched him sexually.  At that point

13  the prosecutor objected, instead of just asking another

14  question, asked for a recess, went out and discussed the

15  matter with his family.  And with Matthew.  And then he

16  came back and said it was Richard.

17          MS. SADKER:   (Pause)  I'm just looking for the

18  page, Your Honor.

19          THE COURT:   I'll give you time to look at that.

20  This really is not relevant to the issue of new evidence,

21  so I'm not -- I'm not to that page yet.  I want to finish

22  with the new evidence.  If you have anything further to say

23  about whether there's sufficient new evidence to get

24  through the Schlup gateway.

25          MS. SADKER:   I believe the only new evidence

1   presented is the testimony of the expert, and I don't

2   believe that alone is sufficient to get to the Schlup

3   gateway.

4         THE COURT:   Mr. Sady, do you want to say any

5   more about the new evidence because I'm likely to make a

6   decision on that issue before we go into the second phase.

7         MR. SADY:   Your Honor, I would just point out

8   that the -- I believe the Court's recollection of the

9   testimony about Richard never having been alone is correct

10   from page 105 of the transcript in which Cheryll Lee

11   clarified --

12         THE COURT:   But this isn't new evidence.

13         MR. SADY:   No, I'm sorry, that was responsive.

14   The information that we provided in the briefing and in the

15   exhibits is the information we believe that's properly

16   considered as new evidence.   That under the Carriger

17   standard it's been readopted in the passage that I recited

18   to the Court that's even reflected in Sistrunk.   And House

19   is clear that even if it just goes to reliability, that the

20   testimony is proper under the Schlup standard and should be

21   sufficient to take this case through the gateway to be able

22   to get to the constitutional issues.

23         THE COURT:   All right.   I'm going to -- I'm

24   going to give you a decision on that.   Because you can

25   tell, I have studied this record very carefully.   These are

1    serious cases.   The sodomy of Matthew is vicious and awful.

2    And if the defendant committed it, he should be sent to

3    prison forever.   He's been there already now almost 13

4    years or 14 years.

5              However, he should not have that on his mark

6    if he's not guilty of it, and I believe there is new

7    evidence to justify getting through the Schlup gateway.

8    The new evidence being that an expert should have been

9    called.   The record reveals obvious confusion between the

10   infant and the defendant and Robert Nachand.   The hearsay

11   statements by the two police officers and the father

12   inconsistent with Matthew's testimony at the trial, make it

13   very serious to me that there should have been evidence by

14   an expert in connection with child psychology.

15             There is extensive confusion.   The time of

16   the last five months between the time these incident

17   happened and the time the police officers and the father

18   got into the situation.

19             There were extensive leading questions.   The

20   record was not recorded.   There was no test to the

21   objectivity of the police officer's statement and the

22   inconsistency between Matthew's testimony and the

23   statements of the police officers.

24             The police officers -- the prosecution first

25   called Matthew to the stand.   He was the first witness to

1   the stand.  And his testimony was rather inconclusive about

2   sexual touching but completely devoid of any reference to

3   the sexual -- to the total deviation.

4              And the fact that the prosecution first

5   called Matthew and then called the police officers after

6   Matthew to in effect impeach or strengthen Matthews

7   testimony made it subject to some additional rules under

8   802 of the state rules about the reliability of the

9   testimony.  While that's not an issue where there's just

10  simply direct testimony in the case by a hearsay observer,

11  when the witnesses becomes unavailable different rules

12  apply.

13             So you then have the exceptional rules that

14  give us the opportunity to look at that very carefully in

15  light of the fact that by putting Matthew on first, having

16  him testify, and then taking him off, they really made

17  unavailable the cross-examination of Matthew.

18             I think there's no question that defense

19  counsel acted properly in not discussing anything further

20  with Matthew after the testimony he gave at the trial.  And

21  certainly after the police officers testified, he couldn't

22  then call Matthew.  That would have been the height of

23  absurdity for a defense lawyer.

24             So, I'm satisfied that there's a need --

25  there was a need for expert testimony, that there was new

1    evidence from Dr. Bruck that expert testimony should have

2    been given.  She outlined in some detail that fact.

3              Now the most serious thing, in my judgment,

4    the most serious new evidence is the refusal to allow

5    defense counsel at the trial to put on evidence of the

6    actual sodomy by Robert of Matthew at about this same time,

7    which makes it very difficult for a four-year-old at that

8    time to differentiate between two adults and the number of

9    things that happened in five months later to give an

10   accurate description of it.

11             I'm satisfied it's new evidence that Robert

12   committed sodomy with Matthew.  It should have been allowed

13   right from the beginning.  The defense lawyer should have

14   been allowed to base his case on that.  The argument of

15   defense counsel was in effect confusion between these

16   adults, three adult that were around him, even though I

17   think counsel is correct there's not enough evidence about

18   Larry to make that new evidence worthwhile.

19             So, I'm saying there's new evidence as to a

20   need to call an expert, there's new evidence that should

21   have been allowed right from the beginning that Robert

22   committed sodomy with Matthew.  And while the respondent's

23   arguments are as best they can make on the transcript,

24   there were smatterings of that that got in, but that should

25   have been the defense case.  That's new evidence.

1           In my opinion, those two items of new

2   evidence, if they had been received, would have caused a

3   reasonable jury to have a reasonable doubt about the guilt

4   of the defendant on sodomy --

5           MS. SADKER:   Your Honor --

6           THE COURT:   -- not on sexual abuse.

7           MS. SADKER:   If I may, I believe that the

8   evidence, the new evidence that comes in is not just the

9   evidence they present but it's also the evidence we

10  present.

11          Now, I've spoken to Matthew and -- and as

12  I've already requested more time to bring him here, I can

13  certainly produce an affidavit to the existence of the

14  sodomy.

15          THE COURT:   He is now 19 years old.  He was four

16  years old at the time this happened.  He has been through

17  all kinds of interrogation and questioning by his father.

18  His father said, "Are you sure it was Richard instead of

19  Robert."  And his father says, "Well, yeah, he said it was

20  Richard.  Constantly the child, a four-year-old failed to

21  make distinctions between Robert and Richard.

22          I read and studied that affidavit.  I put no

23  emphasis on that at all, and I don't think that would make

24  any difference in any event on whether we pass the Schlup

25  gateway.  The evidence there on those two issues that I've

1    ruled on gets us past the Schlup gateway.

2            From there on I'm ready to go ahead and hear

3    arguments on the rest of the case, understanding counsel

4    for the respondent wants to do some more briefing, and I

5    will let you do that, and I will consider it before I make

6    a decision in that.  But I will hear what arguments you

7    have now beyond the Schlup case or gateway.  We are over

8    Schlup gateway at this point.

9            All right.  At this time, Mr. Sady, you can

10   make your arguments accepting the fact you're through the

11   Schlup gateway.

12           MR. SADY:  Yes, Your Honor.  I would refer the

13   Court to -- as the Court noted, we briefed extensively on

14   the merits of the question, and the merits are -- to me

15   this case is a Jackson vs. Virginia sufficiency question.

16   I mean, if -- that's actually the last of the legal issues

17   that's raised.

18           But I think it's very important in terms of

19   framing the absolute lack of admissible evidence that --

20   upon which this conviction was based.  Especially on the

21   sodomy conviction.  We have that the only testimony

22   regarding -- from the child obviously did not go into

23   that -- into anything beyond the single incident of

24   touching.

25           THE COURT:  That raises a constitutional issue,

1  doesn't it --

2          MR. SADY:   Yes.

3          THE COURT:    -- in that the trial judge under 512

4  ruled it out and the Constitution says you can't do that in

5  a case of this sort.

6          MR. SADY:   That is --

7          THE COURT:   There are many cases on that

8  subject.

9          MR. SADY:   That's is correct.  The major issue

10  is the confrontation clause, the Sixth Amendment, and in

11  many different manifestations throughout this case.  The

12  major one, of course, is under the Ninth Circuit opinion in

13  LaJoie, practically the same thing, improper exclusion --

14          THE COURT:   LaJoie is almost in point, isn't it?

15          MR. SADY:   I believe it's directly on point for

16  us.  That's why we briefed it extensively.

17          THE COURT:   I'll ask counsel for the respondent

18  about the LaJoie case.  It seems to me it's almost in

19  point.  I mean, it did involve a failure to give a 15-day

20  notice rather than the procedural aspects that we have in

21  this case.  But other than that, as far as the

22  constitutional issues, it's in point, I believe, isn't it?

23          MR. SADY:   I believe it's directly on point and

24  controlling, and that that alone can provide the basis for

25  the court ruling.  But the Sixth Amendment problems

1    infected this case throughout.  The hearsay testimony from

2    Officer Fowler, all of this was hearsay, all of it was not

3    within a well established --

4            THE COURT:   Neither one of you briefed the 802

5    exceptions.  Clearly, hearsay is proper in this case.

6    There's no serious question about that.  It was proper to

7    give hearsay testimony under 802, wasn't it, Mr. Sady?

8            MR. SADY:   I would disagree based --

9            THE COURT:   Well, the law --

10           MR. SADY:   -- on Wright and the problems with

11   confrontation in a situation where the -- there is -- the

12   child has testified.

13           THE COURT:   Well, you can expand on that because

14   that worries me a little, too.  But straight up, without

15   that, let's say that the child testified or that any minor

16   testified, there could be hearsay testimony because the

17   witness was available, the declarant was available, and

18   that's true here, isn't it?

19           MR. SADY:   I believe it's still hearsay, out of

20   court -- the analogy I'm drawing in my mind is to the

21   situation where an exculpatory type of statement is -- it's

22   still hearsay regardless of whether the person is available

23   or not and it would need to fall within an exception, I

24   believe.

25           THE COURT:   And it does if the declarant is

1     available to testify.  The hearsay evidence is available,

2     isn't it?

3          MR. SADY:   I believe it still needs to fall

4     within an exception.

5          THE COURT:   Tell me about that.

6          MR. SADY:   The out of -- because the witness,

7     and I believe it's the Lowery case that we referred the

8     Court to, the witness has testified, the witness is then

9     off the stand and no longer available for

10    cross-examination, and then the hearsay is going on about a

11    new area.

12          I believe that, as the Court pointed out in

13    at least two cases courts have held, that that type of

14    going to a new area renders the -- that regardless of the

15    earlier availability, in order to get around confrontation

16    problems, you still cannot require that person to -- the

17    defendant to rely on cross-examination of a hearsay

18    declarant.  We still do not have the confrontation that's

19    required.  It's still an out-of-court statement offered for

20    the truth of what it asserts, even though the end is not

21    the opportunity for cross-examination that would create an

22    exception.

23          THE COURT:   I want you -- you're about as

24    unclear as I am on that subject and it wasn't briefed by

25    either side in the 802.  So during the noon hour I want you

1   both to study that.

2            There is an exception.  The only exception

3   is if the witness is unavailable.  But if the witness

4   testifies and then, I believe, that 802 allows hearsay

5   testimony, and there are very limited exceptions, but I

6   want you both to look at that and we'll discuss it more

7   after lunch.

8            MR. SADY:  Your Honor, my suggestion -- I will

9   certainly do that.  The Lowery case I was referring to is

10  referred to on page 27 of our memorandum.  I believe that

11  functionally he's unavailable once they have released him

12  from the stand and they ask about new material.  So that

13  our position would be that the confrontation clause problem

14  is not solved.

15           THE COURT:  So you think it sits within the

16  exception to the 802 and that exception is that the witness

17  is no longer available once the prosecution calls him and

18  releases him?

19           MR. SADY:  That's how we have analyzed --

20           THE COURT:  Do you think Lowery covers that

21  situation?

22           MR. SADY:  I think that is -- yes, I think it --

23           THE COURT:  All right.  I'll read Lowery at noon

24  and both counsel can and we'll hear more about that.

25           MR. SADY:  And we'll certainly look at 802 and

1   provide a short submission on that.

2          THE COURT:    All right.   Before we recess, other

3   than to renew your motion for continuance to take up all

4   this later, do you have anything else?   Make that motion on

5   the record, which I will then deny.

6          MS. SADKER:    Thank you, Your Honor.

7          Your Honor, we're not prepared to argue

8   these claims.   We haven't briefed them.   The point of this

9   evidentiary hearing was petitioner requested the

10  opportunity to testify and to present witnesses that were

11  present at the time.

12         So we've spent a great deal of time

13  preparing for that.   We have not prepared for the merits of

14  the ineffective assistance claim.   We can try over the noon

15  hour to get up to speed on this --

16         THE COURT:    I want you to tell me generally.

17  You've been heavily involved in this case, as I have.   Tell

18  me what areas you don't feel you're prepared in,

19  specifically.

20         MS. SADKER:    The confrontation clause issues,

21  the Rule 802 analysis.

22         THE COURT:    We're going to solve that this

23  afternoon.   You can study it.   You can read the Lowery case

24  and any other cases you want and we'll solve that this

25  afternoon.   You don't need to brief that.

1          MS. SADKER:   Your Honor, I would --

2          THE COURT:   This case has been going on since

3    1993 and I'm not going to let it go on any longer on my

4    watch.

5          MS. SADKER:   Well, it hit my desk just a few

6    months ago, Your Honor, so I'm personally not prepared --

7    I'm not prepared to address those issues.  I'll be happy to

8    do what I can.

9          THE COURT:   You say you're not prepared to

10   address the 802 issues?

11         MS. SADKER:   I'll do what I can over the lunch

12   hour, but I would much prefer the opportunity to make

13   written briefing and continue this hearing until I've fully

14   --

15         THE COURT:   What else don't you have?  What else

16   aren't you prepared on?

17         MS. SADKER:   I'm not sure what else he's going

18   to raise now.

19         THE COURT:   Well, you've seen it in his brief

20   everything about the inadequacy of counsel.  It's some 70

21   pages of his brief.  Most of that is -- a good bit of that

22   is devoted to inadequacy of counsel.

23              For one thing, it was inadequate of counsel

24   not to pound the table and beat the desk on the 512 ruling

25   the judge gave.  I don't think most trial lawyers would

1    have given up without some proof and some serious arguments

2    on the subject.

3          MS. SADKER:    I believe the lead counsel was

4    persistent in his objection to that and he put on an offer

5    of proof of the testimony.

6          THE COURT:    I'll study the transcript on that.

7          MS. SADKER:    Okay.

8          THE COURT:    Anything else you can think of that

9    you want to brief?

10         MS. SADKER:    Respondent requests the opportunity

11   to brief the merits of the petition.

12         THE COURT:    You'll have to tell me why.

13         MS. SADKER:    The ineffective --

14         THE COURT:    You've seen his brief, you've read

15   the transcript, I know, and you have got to tell me what

16   you're talking about generally.  You don't have to tell me

17   what your evidence is, but are you talking about inadequacy

18   of counsel?

19         MS. SADKER:    Yes, Your Honor.

20         THE COURT:    Is that the only issue?

21         MS. SADKER:    And the confrontation clause issue.

22   Your Honor is concerned about the 412 issue which is

23   mentioned in the brief but I'm not sure it's an actual

24   ground for relief, so there are a number of issues in this

25   brief that I would like the opportunity to --

 1          THE COURT:   No, no, I don't want a number.  I

 2    want you to tell me now what they are.

 3          MS. SADKER:   The ineffective assistance of

 4    counsel claim, the confrontation clause claim, the Rule 412

 5    argument, the failure to --

 6          THE COURT:   Rule 412 is what?

 7          MS. SADKER:   It's a denial of --

 8          THE COURT:   Initial motion.  I thought it was

 9    512 but --

10          MS. SADKER:   I'm sorry.

11          THE COURT:   -- it may be 412.

12          MS. SADKER:   Yes, that's what I'm talking about.

13          THE COURT:   Okay.

14          MS. SADKER:   I believe that covers it, but --

15    oh, and the sufficiency of evidence claim --

16          THE COURT:   Well, if you think of any more, you

17    can raise them.  After lunch if you think of any more.  I'm

18    going to listen to anything you say about the need for a

19    continuance.

20              And I apologize for the abruptness with

21    which I've treated both counsel in this case, but I am

22    always disturbed about the seriousness of the charge,

23    whether it's right or wrong, and the length of time that

24    has gone on in this case, which is inexcusable.  Partly the

25    justice system, of course, partly -- most of the lawyers,

1    in any event.  That's the reason I'm rather firm about

2    this.

3                So we will recess now until 1 o'clock.

4    You'll have an hour and a half.  I particularly want you to

5    take a look at Rule 802 in the exceptions to it.

6                I don't think I need any more briefing on

7    the confrontation clause.  The cases, the LaJoie case are

8    very clear that the Rape Shield Act does not protect

9    against the Constitution's right to confrontation of the

10   witnesses if that's what you're thinking.

11               You're going to have to convince me that

12   there's something more I need to hear on that subject after

13   lunch.  I can't think of anything else, but I'll hear you

14   after lunch about what you might want to brief.

15               Okay.  We'll be in recess till 1 o'clock.

16                     (Recess)

17          THE COURT:  Be seated, please.  Well, I hope you

18   all had a very relaxing and pleasant lunch.

19               Having been a trial lawyer for a while I can

20   appreciate that that does never happen.

21               803.  Mr. Sady, I've looked at Lowery very

22   carefully.  Lowery does not involve the precise situation

23   we're involved with here.  If I'm not mistaken, you can

24   correct me, but it looks to me like Lowery deals with a

25   situation where the child was available but was not called

1   by the prosecution.

2         MR. SADY:    That is correct, Your Honor.  And

3   they showed a videotape of an interview with the child.

4         THE COURT:    Uh-huh.

5         MR. SADY:    As I understand it.

6         THE COURT:    You're right, they showed a

7   videotape.    That was objected to.  And the Court ultimately

8   said that's a violation of the confrontational rights.

9         MR. SADY:    And that he had not waived that --

10        THE COURT:    He had not waived it.

11        MR. SADY:    -- by failing to call the child --

12        THE COURT:    That's right.

13        MR. SADY:    -- even though the child was

14   available.

15        THE COURT:    Even though he had a chance to call

16   him.    The child never testified in Lowery.

17        MR. SADY:    That's correct.

18        THE COURT:    Okay.  In our case the child did

19   testify first and then the Government released him after he

20   had put in, in fact, to the Government's case on sodomy.

21        MR. SADY:    Yes.

22        THE COURT:    Not child molestation but on sodomy.

23   And at that point, then, the Government tried to put in

24   hearsay evidence.  And it's your position that by doing

25   that the state forced the defense to recall the child

 1   witness to offset that hearsay testimony and, therefore,

 2   it's like <u>Lowery</u>.

 3        MR. SADY:   That is the similarity.   There's

 4   another piece to it, and that is that the testimony itself

 5   was hearsay at that time.   It was offered for the truth of

 6   what was asserted.   And that the declarant, the accusatory

 7   declarant was not available.

 8             So it's just like <u>Wright vs. Idaho</u> -- <u>Idaho</u>

 9   <u>vs. Wright</u>, the Supreme Court case, where a pediatrician

10   testified, and they said no, you have to have the person

11   available to cross-examine.

12             And so both -- for both of those reasons, I

13   believe that a competent attorney would have objected at

14   that point and excluded that material and forced the matter

15   to close with an acquittal on the -- a judgment of

16   acquittal because you couldn't have got past at that point

17   a motion for judgment not --

18        THE COURT:   Right.   Let's go --

19        MR. SADY:   A judgment for acquittal.

20        THE COURT:   Let's assume that you're right, that

21   the victim child Matthew was not available after the state

22   released him.   And then they come on with the hearsay

23   testimony.   Under 802 that testimony, even when the witness

24   is not available, is still admissible.

25        MR. SADY:   I believe it is not admissible under

1    <u>Wright</u> because they say unless it falls within a firmly

2    established exception to the hearsay rule, it is still

3    hearsay and inadmissible.

4            THE COURT:    All right.  802 makes those

5    exceptions, doesn't it?

6            MR. SADY:    Yes.

7            THE COURT:    What are those?

8            MR. SADY:    There are a number of them and the

9    ones -- and I don't believe any of them apply to this case.

10           THE COURT:    Read them to me.  I want to hear

11   them again.

12           MR. SADY:    I don't have the full statute, but I

13   believe those are things such as excited utterance, for

14   medical purposes, that type of exception.  And in order for

15   any of the exceptions to apply to this case, first of all,

16   they'd have to be firmly established, and I believe there

17   is no firmly established exception that would apply, and

18   none of the statutory ones in Oregon would apply because

19   there was no -- none of the notice that was required or the

20   other types of positions required.

21           THE COURT:    Something tells me that has to be

22   wrong, and I'll tell you why:  Because if a child is unable

23   to testify, two years old, are you saying you can't have

24   any hearsay testimony?

25           MR. SADY:    I believe that that's exactly what

1    <u>Wright</u> gets down to, it says that --

2         THE COURT:   Well, I don't think that's right.   I

3    would hate to think that was right.   Because there are

4    certain circumstances where clearly hearsay has to be

5    admissible.

6              And I think under 802, the rule is that if a

7    child is not available, hearsay testimony is allowed with

8    some modifications.   In other words, I think the rule says

9    it's okay to allow the hearsay but you have to look at a

10   whole bunch of things to justify it.   And then it's up to

11   the trial judge to determine whether it's reliable

12   testimony or not.

13        MR. SADY:   Even if there were such a provision

14   that makes an exception for <u>Wright</u> for -- where there

15   indicia of reliability, and I believe the indicia of

16   reliability is exactly coextensive with the firmly

17   established exceptions to the hearsay rule.

18             And that's what -- for example, if a -- you

19   know, the spontaneous utterance occurred, that type of

20   thing, that that would provide the reliability that's

21   otherwise present.

22             But even under classic pre-<u>Crawford</u>

23   confrontation clause analysis, the reliability question

24   here is what we were talking about all morning, and I think

25   it readily jumped out from this record is that they could

1   never have gotten past any kind of requirement of

2   reliability where they didn't record it, they had a person

3   --

4           THE COURT: That may be. I'm not --

5           MR. SADY: And so, eventually, regardless of the

6   legal point that we're discussing, they could never pass

7   the reliability test under these circumstances. This is

8   one of the grossly suggested and unreliable situations

9   regardless of what, you know, the rules may be.

10          THE COURT: I understand your position.

11               All right. Respondent's position on 802 and

12   the confrontational clause.

13          MS. GLEASON: Yes, Your Honor. Summer Gleason.

14              Your Honor, we believe that the child's

15   statement was admissible as a hearsay exception under

16   80318(a)(B). Under 80318(a)(B) a child who has been the

17   victim of sexual abuse and testifies in a proceeding,

18   thereafter hearsay statements of that child made outside of

19   court are admissible.

20          THE COURT: Wait. Wait. Let me stop you there.

21   You're saying that if the child testifies, then hearsay is

22   admissible?

23          MS. GLEASON: Right.

24          THE COURT: Okay. Now --

25          MS. GLEASON: Let me go further.

1          THE COURT:   Go ahead.

2          MS. GLEASON:   If the child does not testify or

3  is unavailable, an unavailability refers to many things

4  including a child's block of memory regarding the events.

5  Then the hearsay statements of a child may be admitted as

6  an exception under 18(a)(B) if the Court finds some indicia

7  of reliability.

8          And 80318(a)(B), subsection (A) begins with

9  the factors.  Personal knowledge of the declarant.  Did

10  Matthew have personal knowledge that he was sexually

11  abused?  It's clear he did.  He first told Cheryll Lee

12  within a couple of days that Robert had touched him.  He

13  then told his father --

14          THE COURT:   Let me ease you a little bit.  I'm

15  going to let you brief this.  All of these issues.  In

16  fact, all of part two of this case.  I'm going to let you

17  brief it because I think -- and I think I want to make sure

18  of this.  This is an important issue on phase two.

19          I don't want you to brief phase one, that

20  is, whether new evidence gets us past the Schlup gateway.

21  You don't need to brief that because I have decided that.

22  You can argue that on appeal.  But you can brief the second

23  phase of it.

24          So I will let you -- right now I want to

25  know your understandings of the rules, and you've pointed a

1  very good one out to me that seems to make sense.  That is,

2  even if the child is unavailable, it can be hearsay

3  testimony, and it's up to the judge to determine under a

4  number of factors whether or not that's admissible.

5          MS. GLEASON:   That's correct, Your Honor.

6          THE COURT:   Okay.

7          MS. GLEASON:   And at the time of this case Ohio

8  v. Roberts was the controlling authority because Crawford

9  had not yet been decided.  And under Ohio v. Roberts it was

10  clear that testimony would be admissible if it fell under a

11  firmly rooted exception to hearsay.

12          And under Oregon law, 80318(a)(B) has long

13  been a firmly exception -- a firmly rooted exception to

14  hearsay.  So we believe either under the fact that Matthew

15  was actually present and testified, the reason that the

16  court found that he was not later available, that it would

17  be admissible.

18          I would also like to draw the Court's

19  attention to the transcript on page 91, which at the end of

20  Matthew's --

21          THE COURT:   Read it to me.

22          MS. GLEASON:   At the end of Matthew's testimony

23  the court did not excuse Matthew, it allowed Matthew to

24  step down.  And so there's no evidence --

25          THE COURT:   Wait a minute.  The state excused

1   him, though.  They didn't ask any more questions.  They

2   said they were through.  And so from there on it was up to

3   the defendant to call him back.

4          MS. GLEASON:   But under -- under the first part

5   of 80318(a)(B), the fact that he testified gets you past

6   the hearsay exception.  The fact --

7          THE COURT:   I'm not sure about that, but that's

8   something you can brief.

9          MS. GLEASON:   Okay.

10          THE COURT:   You know, the law has to make sense,

11   too, and so I'm very interested in a procedure that will

12   protect this victim's rights as well as the defendant's.

13          So, I want your best briefing on that and

14   anything else you want to brief other than on a phase one.

15          MS. GLEASON:   Sure.  Those are the comments I

16   have about the hearsay exception, Your Honor.

17          THE COURT:   All right.  Having said that, I

18   realize, I think, Mr. Sady has pretty well briefed the

19   issues on phase two of the case.

20          MR. SADY:   Our memorandum of law in support of

21   the petition starting at page 22 --

22          THE COURT:   Wait.  Let me just say, I think

23   you've pretty well briefed it.  You can summarize that, add

24   to it, refer to it by page number if you want to, whatever.

25   Or copy what of your old brief you think is still relevant.

 1 | Do anything you want to, but do it within ten days.
 2 |                   Can you do that?
 3 |         MR. SADY:   Yes, Your Honor.
 4 |         THE COURT:   And I will give the State 20 days to
 5 | respond.
 6 |         MR. SADY:   Your Honor, I can file -- I will file
 7 | my brief by tomorrow just so that we can move the case
 8 | along.
 9 |         THE COURT:   Okay.   The State gets 20 days after
10 | they received the petitioner's brief to respond.
11 |         MS. SADKER:   Thank you, Your Honor.
12 |         MR. SADY:   And, Your Honor, if we could just
13 | have a few days to reply?
14 |         THE COURT:   Yes, you can have five days to
15 | reply.
16 |         MR. SADY:   Given that we are -- Thank you.
17 |         THE COURT:   And then the State can have two days
18 | to surreply.
19 |                   You know, the wonderful thing about federal
20 | court is that nothing ever comes to an absolute end.   You
21 | know, people can always ask for more time, more papers, and
22 | so we bill lots of papers.   Okay.
23 |                   I do want to commend all of you on good
24 | briefing, good efforts, courtesy in the face of my
25 | tyrannical approach to you.   But I -- as I indicated, we're

1  going to get this concluded one way or another pretty

2  quick.

3             Anything further at this time?

4             I want to set a date for further arguments.

5             Mark, let me see a calendar.  I think I'm

6  going to be here again in --

7         LAW CLERK:   December.

8         THE COURT:   -- in December, yeah.  Wait a

9  minute, I'll find one here.  Get me my calendar off my

10 desk.  That's easiest.

11        MS. SADKER:   Your Honor, I do have one

12 additional matter.

13        THE COURT:   All right.  Let's get this resolved

14 first.  Unless it has something to do with the date.

15        MS. SADKER:   No.

16        THE COURT:   Does it?

17        MS. SADKER:   No, Your Honor, it does not.

18        THE COURT:   All right.  I'm looking at December

19 17th, I believe.  My clerk will confirm that once he gets

20 back.

21             Is that available to both of you?

22        MR. SADY:   I believe it is, Your Honor.

23        THE COURT:   I could set it for the 26th of

24 December but I won't do that to you.

25                  (Laughter)

```
 1            MS. SADKER:   I believe the 17th works, although
 2    I don't have a calendar.
 3            THE COURT:   That's a Monday.  Do I have anything
 4    else that Monday?
 5            THE CLERK:   That's a Wednesday.
 6            THE COURT:   Or that's Wednesday.
 7            THE CLERK:   Uh-huh.
 8            (Discussion held off the record)
 9            THE COURT:   Let's make it Tuesday the 16th.
10              Is that the right date, Debra?
11            THE CLERK:   Yes, Your Honor.
12            THE COURT:   Tuesday the 16th.
13            MS. SADKER:   Your Honor, I'm on vacation that
14    week.  I've already made arrangements.
15            THE COURT:   Well, when do you go on vacation?
16            MS. SADKER:   I return from vacation on the 16th.
17            THE COURT:   On the 16th.
18            MS. SADKER:   Yes.
19            THE COURT:   I don't want to interfere with
20    anybody's vacation.  The alternative is to argue it in
21    Medford which you can do as well as here.
22              So, let's go back, Debra.  I'm going to have
23    to see a calendar.  Get me a calendar off my desk, will
24    you.
25            THE CLERK:   Mark is.
```

1          THE COURT:    Is he getting it?   Okay.

2                    (Discussion held off the record.)

3                    When are you on vacation, what date?

4          MS. SADKER:    December 7th to the 16th.

5          THE COURT:    All right.   When's it start?

6          MS. SADKER:    December 7th.

7                    (Law clerk returns)

8          THE COURT:    Seems to me you'll have all your

9    work done when you go on vacation.

10                   How about Thursday, the 18th?   It gets kind

11   of difficult.   You've got very competent assistant counsel

12   here that you've just joined, so let's do it on Thursday,

13   the 18th here in Portland.

14                   Is that all right for everybody?

15         MS. SADKER:    That's fine with me.

16         THE COURT:    All right.   We'll do it at 10

17   o'clock in the morning on Thursday, the 18th.

18         MS. SADKER:    Thank you, Your Honor.

19         THE COURT:    Thank you all very much.   We'll be

20   in recess.

21                         (Concluded)

22

23

24

25

1        I certify, by signing below, that the

2   foregoing is a correct transcript, to the best of my

3   ability, of the record of proceedings in the above-entitled

4   cause.

5

6   _____          10-31-08

    DENNIS R. GRUBE                      DATE

7   Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25