IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

```
RICHARD LEE,                    )    CV 02-300-CL
                                )
                Petitioner,     )    OPINION AND ORDER
                                )
        v.                      )
                                )
ROBERT LAMPERT,                 )
                                )
                Respondent.     )
_____)
```

**PANNER, Judge**.

Petitioner Richard Lee brings this action pursuant to 28 U.S.C. § 2254, challenging his 1995 state court convictions on two counts of first degree sexual abuse and two counts of sodomy. Respondent argues that Lee's petition was not filed in time and therefore is procedurally barred, and he does not qualify under the "actually innocent" gateway recognized in <u>Schlup v. Delo</u>, 513 U.S. 298 (1995).  Respondent also contends the petition fails on the merits.

On March 11, 2008, Magistrate Judge Clarke filed his Report and Recommendation, which concludes the petition should be denied

on procedural grounds.  "The court is troubled by the confusing testimony of the young victim in the context of multiple alleged abusers and potential evidentiary problems at trial.  Newly presented reliable evidence presented by petitioner compounds the concerns of the court.  However, under habeas corpus law, there is nothing at the federal habeas level to reach these concerns."  Report and Recommendation p. 14.

Petitioner timely objected.  The matter is now before me for *de novo* review pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b).

## **Background**

Beginning in October 1993, Daniel Hendricks and his wife paid Cheryll Lee to provide childcare services for the three Hendricks children at Cheryll's apartment, from approximately 6:00 a.m. to 3:30 p.m.

Cheryll's boyfriend, Robert Nachand, resided with Cheryll.  He usually was home from around 9:00 a.m. until evening.  Robert had been indicted for molesting two young girls he was babysitting (and reportedly molested a third).  Robert had admitted other episodes of sexual conduct with children.  Cheryll knew Robert Nachand was not to be left alone with children.  Cheryll acknowledges she left four-year old Matthew Hendricks alone with Robert on at least five occasions while she ran errands.

2- OPINION AND ORDER

Cheryll's ex-husband, Larry Lee, was indicted for molesting his three-year old niece in 1992. Larry Lee entered a no contest plea and was taken into custody on or about November 23, 1993. Until then, Larry Lee sometimes visited Cheryll's apartment when the Hendricks children were present.

Petitioner Richard Robert Lee is the brother of Larry Lee, and Cheryll's ex-brother-in-law. Richard visited Cheryll's apartment about twice a month during the Fall of 1993, or perhaps more frequently.

In mid-October--roughly two to three weeks after he started going to Cheryll's apartment for daycare--Matthew began wetting his bed, throwing temper tantrums, and crying that he didn't want to go to Cheryll's apartment. Matthew preferred that Cheryll come to his home instead. In January 1994, Cheryll began baby-sitting the three children at the Hendricks home.

In late February 1994, Matthew's mother and a friend were discussing child sexual abuse. During that conversation, Matthew volunteered that Robert Nachand had fondled and fellated Matthew, and that Matthew performed similar acts upon Robert. Matthew said this happened several times when Cheryll was not home. Robert had let Matthew play Nintendo as an inducement to cooperate. Matthew's mother notified the police. Cheryll eventually was terminated as the Hendricks' baby-sitter.

/ / / /

On March 14, 1994, Matthew was questioned by Detective
Carter, with the aid of anatomically correct drawings.  Matthew
volunteered information about abuse by Robert.  The police report
describes what Matthew told and showed the officer, including
sexual acts Robert performed on Matthew and vice versa.  Matthew
said this occurred on four to six occasions.  Carter's report
states that Matthew did not mention "any other sex abuse that
occurred to him or his sisters."[1]

Robert Nachand initially denied molesting Matthew, but
eventually entered into a plea bargain.  Nachand pled guilty to
sexual abuse and was sentenced to 23 months in prison.  In
return, the prosecutor dropped a sodomy charge that could have
sent Nachand to prison for many years.

In June 1994, Matthew's father, Daniel Hendricks, saw
Richard Lee walking in the neighborhood and asked Matthew whether
Richard also had molested him.  Daniel says Matthew responded
affirmatively.  Daniel reportedly then questioned Matthew,
possibly on more than one occasion.

On July 1, 1994, Daniel brought Matthew (now five) to the
police station for an interview with Detective Fowler.  Matthew
indicated to Detective Fowler that he was at the police station

---

1  The final paragraph of the police report suddenly begins
using "Richard" though the author clearly intended to say
"Robert."  The report purports to have been prepared March 16,
1994, months before Richard was a subject of the investigation.

because he had been touched in the groin.  Daniel remained in the room during the interview.  Fowler utilized anatomically correct dolls.  One was designated Robert, one Richard, and one as Matthew.  Fowler says he had Matthew demonstrate, with the dolls, what sex acts occurred with each person.  Fowler photographed the positioned dolls.  Detective Fowler deliberately did not make a video or audio recording of the questioning.  Fowler later testified that recording of interviews is specifically "discouraged" in child sex abuse cases in Linn County, Oregon.

Later that month, Fowler questioned Cheryll.  She initially stated that Richard left whenever the children came over, because he was not supposed to be around children.  When threatened with prosecution for obstructing an investigation, Cheryll reportedly told Fowler that on at least three occasions, she had gone to the store briefly, leaving Richard and the three children at the apartment.  Approximately two days after one such occasion, Matthew told Cheryll that Richard Lee had "touched his pee-pee." Cheryll says she confronted Richard, who replied that he must have accidentally touched Matthew while they were wrestling the other day, when she was at the store.

On September 27, 1994, Richard Lee was indicted for two counts of Sexual Abuse I and two counts of Sodomy I.  Oregon Rule of Evidence § 412 (1995), sometimes called the "Rape Shield Law," prohibits introducing "evidence of a victim's past sexual

behavior" in a prosecution for certain enumerated offenses unless the conditions stated in O.R.E. § 412 are met.  The party seeking to offer the evidence must file a pre-trial motion and make a written offer of proof.

Richard Lee's attorney sought leave to offer evidence regarding the abuse of Matthew by Robert Nachand, who by now had entered a guilty plea.  Lee's attorney argued that the sexual acts involving Robert occurred in the same location, during the same time period, and involved much the same conduct as the allegations regarding Richard Lee.  The motion was denied, on the ground that Matthew was capable of distinguishing between Richard and Robert, and because of Cheryll's statement that Richard had acknowledged some type of touching could have occurred when he and Matthew were wrestling.

A jury trial was held on April 17-18, 1995.  By then, Matthew was almost six.

*Excerpts from direct examination of Matthew Hendricks*

Q:    Do you know who this is, Matthew?  What's his name?

A:    Robert - I mean, Richard.

Q:    Matthew, do you know why you're here today?

A:    No.

Q:    Do you know why you've come to court today to talk to us?

A:    No.

Q:   Did -- did Richard do anything that you wanted to talk
     to us about?

A:   No.

The prosecutor had Matthew count to twenty, recite the
alphabet ("now I know my ABCs"), and state the words for
different body parts.  For the most part, Matthew responded
correctly, though some ambiguity was evident:

Q:   Ears.  And anything else on there?

A:   And a bottom.

Q:   A bottom?  Okay.  What do you call that part of your
     body?

A:   A back.

Q:   Huh?

A:   A back.

Q:   Do you call it a bottom?

A:   Yeah.

Q:   What's the part that you sit on, Matthew?

A:   Behind.

* * * *

Q:   Do you see the part of the body where you go to the
     bathroom?

A:   Yeah.

Q:   Is that on the picture?

A:   Yeah.

Q:    What do you call that part, Matthew?

A:    Privacy.

Q:    Privacy.  Okay.  Did -- did he every touch you on any

      part of you body that you see there in the picture?

A:    Yeah.

Q:    Okay.  Can you put a circle around the part?

      Matthew, what part did you circle?  Can you say the

      name for us?

A:    Pee-pee.

Q:    Okay.  And can you go to the other picture now.  All

      right.  Did he ever touch you on any part that you see

      in that picture?

A:    Yeah.

Q:    Okay.  Can you do the same thing and go ahead and put a

      circle around the part?  All right.  Can you tell us

      now what part you circled?

A:    A bottom.

* * * *

Q:    All right.  When - when he touched you on those parts

      of your body, did you have your clothes on or off?

A:    Off.

Q:    All of your clothes?

A:    Yeah.

* * * *

Q:    Did he have his clothes on or off?

A:    Yeah.

Q     Do you remember which was off?

A:    His shirt.

Q:    His shirt.  Anything else?

A:    No.

Q:    Was his pants on?

A:    Yeah.

Q:    When he touched you on the part of the body there that
      you circled, what did he touch you with?

A:    With his hand.

Q:    With one hand or both hands?

A:    One hand.

Q:    And did he touch you on your pee-pee with one hand?

A:    Yeah.

Q:    And on your bottom with one hand?

A:    Yeah.

Q:    All right.  Did - did he touch you on your bottom with
      anything else but his hand?

A:    No.

Q:    And did he touch you on your pee-pee with anything but
      his hand?

A:    No.

Q:    Are you scared of him?

A:   No.

* * * *

Q:   Matthew, did you tell anyone what he did?

A:   My dad.

Q:   Did you tell Cheryll?

A:   I kept telling her.  She couldn't listen.

* * * *

Q:   Do you remember -- do you remember when it was that you
     told her?

A:   After he did it.

* * * *

Q:   Did you talk to a police officer named John Fowler
     about what he did?

A:   Yeah.  And Detective Fowler.

* * * *

Q:   Matthew, do you -- do you remember about those
     pictures?

A:   Yeah.

Q:   And is that you in the picture?

A:   Yeah.

Q:   All right.  What are you doing in those pictures,
     Matthew.

A:   I'm showing them what they were doing.

Q:   Besides you in the picture, what else is in that

picture?

A:    Richard.

Q:    Okay.

A:    And me.

Q:    Is that Richard and you?

A:    Yeah.

Q:    And can you -- can you tell us what's happening in the
      picture?

A:    I don't know.

Q:    Okay.  Did you tell Detective Fowler what was happening
      in those pictures?

A:    Yeah.  Cause he had the paper dolls.

Q:    Okay.  Do you want to tell us what's happening in the
      pictures?

A:    No.

* * * *

Q:    Okay.  Matthew, when he touched you on your pee-pee and
      your bottom, did you see any part of Richard's body?

A:    Yeah.

Q:    What part did you see, if any?

A:    His stomach.

Q:    Did you see anything else?

A:    No.

Q:    Did you see anything that's there in the pictures?

A:   Me showing Detective Fowler with the -- what he was

     doing.

Q:   Okay.  You know on your drawing there that you have on

     that little board there?

A:   Papers?

Q:   Did you see anything on those pictures on the -- on

     Richard?

A:   No.

* * * *

*Excerpts from cross-examination of Matthew Hendricks*

* * * *

Q:   Okay.  And when Ms. Parker first asked you, you know,

     who this was that was sitting here, you said – do you

     remember you said "Robert – I mean, Richard"?

A:   Yeah.

Q:   So you're getting those two people mixed up, huh,

     Robert and Richard?

A:   Yeah.

Q:   And these things that you've talked about, about being

     touched, that was by Robert?

A:   Yeah.

[Prosecutor]:  I have a matter for the Court.

THE COURT:  Okay.  Take the jury out, please.

The attorneys and court then discussed the prior O.R.E. 412

ruling, and what defense counsel would be permitted to ask

consistent with that ruling.  To avoid tainting his testimony,

Matthew was sent out of the courtroom during this colloquy.  When

Matthew returned to the room, the cross-examination resumed:

      * * * *

      Q:  Now, these things that you've described --

      A:  Yeah.

      Q:  -- you said -- you said that's Robert?

      A:  Yeah.

      Q:  Now you said he had his shirt off; is that right:

      A:  Yeah.

      Q:  And -- but he had his pants on?

      A:  Yeah.

      Q:  When he had his shirt off, did you --you know, did you
          notice anything about his body?

      A:  No.

      Q:  Did you see anything on his arms or his stomach or
          anything?

      A:  No.  No.

      Q:  Nothing?  Nothing you can tell us about?

      A:  No.

      Q:  And what -- so he had -- Robert had his shirt off.  Was
          that in the kitchen?

      A:  I don't know where.

Q:   You're not sure where it was?

A:   No.

*Matthew Hendricks testimony, redirect examination*

Q:   Okay.  Matthew, is this Robert?

A:   No.

Q:   Who is this?

A:   Richard.

Q:   All right.  And is this -- is this the person that did
     those things that you've drawn for us today?

A:   Yeah.

*Matthew Hendricks testimony, recross-examination*

Q:   Now, Matthew, I've just got to ask you one more thing.
     Now, you said it was Robert; right?  You said it was
     Robert?

A:   No.  Richard.

Q:   You didn't tell us here a while -- just a few minutes
     ago it was Robert?

A:   No.

Q:   You didn't say that?

A:   No.  It was Richard.

Q:   Now you're saying it's Richard?  Did you talk to your
     dad when you went back out there in the hall?  Talk to
     your mom and dad?

A:   Yeah.

The next witness for the prosecution, Cheryll Lee, testified that her boyfriend, Robert Nachand, shared the apartment during the months she babysat the Hendricks children.  Cheryll also cared for other children at her apartment during some of those months.  In addition, Cheryll's ex-sister-in-law Debbie Lee and Debbie's children also resided in the apartment during part of that time.

Cheryll testified that Richard Lee visited her apartment occasionally, perhaps twice a month.  On three occasions she went to the store, leaving the Hendricks children with Richard Lee.  She was away approximately ten minutes, but no more than twenty minutes.  On all three occasions, Robert Nachand also was in the apartment.  Cheryll believed Nachand and the Hendricks children were sleeping.

About two days after one occasion, Matthew told Cheryll that Richard "touched my pee-pee."  Matthew didn't say anything further about it.  She confronted Richard, who said it must have happened accidentally while they were wrestling when Cheryll was at the store.  Cheryll said she had believed that explanation.

Detective Fowler then testified regarding his interview of Matthew.  Fowler testified he first exposed the dolls' genitals to Matthew.  After some discussion, he and Matthew removed all clothing from the dolls.  Fowler's understanding was that Richard and Matthew were completely naked.

During Fowler's trial testimony, it initially appeared that the questions Fowler posed to Matthew--and the answers given by Matthew--concerned sexual contact only with Richard.  After being confronted with his police report, Fowler acknowledged that some questions he posed to Matthew were phrased in terms of "Richard or Robert" or "Richard and Robert."  Some of Matthew's answers to Fowler's question were likewise ambiguous.  Fowler made no videotape or audiotape of the interview, and no contemporaneous notes have surfaced.

The prosecution objected to this line of questioning.  After a lengthy colloquy outside the jury's presence, the court allowed defense counsel to ask whether a particular question or response referred to Richard or Robert.  However, "I'm not opening the door to Robert's sexual abuse of this boy . . . . I don't want to go into anything more about Robert, other than just that the boy mentioned Robert, and he included Robert as well as Richard."

That wall was partially breached during Fowler's testimony. Fowler eventually testified the Robert and Matthew dolls were both naked, as were the Richard and Matthew dolls.  The Robert doll was depicted performing fellatio on the Matthew doll, and vice versa.  The same was true of the Richard and Matthew dolls. Detective Fowler insisted Matthew clearly distinguished between Richard and Robert.  Despite the extensive overlap between conduct attributed to Richard and to Robert, Fowler believed

there were some differences.  Fowler understood that Richard

allegedly touched Matthew's "bottom" with his penis, kissed

Matthew's "bottom," and rubbed Matthew's "bottom" with a cup and

with a toy that resembled Richard.  Fowler never located such a

toy nor determined what it might be.

Fowler acknowledged "some confusion when discussing the

number of times" certain conduct occurred.  Fowler's testimony

also revealed ambiguity in terminology.  For instance, Matthew

used "bottom" to describe both the buttocks and anus.  It is

unclear what Matthew meant when he said Richard touched his

"bottom."  Fowler did clarify that any touching "was on the

outside and not on the inside."

On the second re-direct examination, the prosecution finally

elicited from Detective Fowler that Robert had molested Matthew,

and that Robert and Richard both frequented Cheryll's apartment.

The full details of Matthew's allegations against Robert were not

heard by the jury.  The court initially indicated it might be

receptive to that evidence, but reversed that ruling after Fowler

stated he lacked personal knowledge.

Detective Fowler also testified that Richard Lee was on

parole at the time of his arrest.  It was not the last time the

jury heard that prejudicial information.

Next, Katherine Walling testified that when she brought her

children to Cheryll's apartment for babysitting during November

1993, she saw Richard Lee there on "some days" "at different times of the day."  The prosecution never asked if Walling saw Richard Lee alone with Matthew.  The implication was that Cheryll was always present.

Detective Strong testified about an interview with Richard Lee, who denied seeing the Hendricks children at Cheryll's apartment or caring for them when Cheryll went to the store. Richard also had denied wrestling with Matthew, or any conversation with Cheryll about Matthew's allegations, and insisted he would not recognize Matthew if he saw him.  Richard had expressly denied engaging in oral sex with Matthew.  The prosecution then rested.

The only witness called by the defense was Matthew's father, Daniel Hendricks.  He admitted a number of convictions for crimes of dishonesty.  Defense counsel sought to establish that a friend or former roommate of Daniel had a confrontation with Richard Lee just before Daniel called the police to report Matthew had been molested.  Daniel indicated he was not "too aware of the confrontation between those two."

Defense counsel elicited some details of the molestation by Robert Nachand and that it occurred in Cheryll's apartment. Defense counsel then wandered into a minefield, eliciting testimony that Richard "did more than touch him.  My son told me that he had been sodomized by him.  Not using the word 'sodomy,'

but he did show me that, 'Yes, Daddy, he stuck it up inside of me.'"  Daniel further testified that Matthew had told Detective Fowler that Richard "put it in his bottom, if I'm not mistaken."

Daniel also testified Matthew told him Robert and Richard had sex with Matthew together, and Matthew performed oral sex on Richard and was sodomized by Richard.  Daniel recalled Matthew saying his bottom had been hurt.  Matthew did not receive a medical examination regard the latter allegation.  Daniel acknowledged Matthew never mentioned abuse by Richard until Daniel specifically inquired in late June 1994.

Daniel testified that after Matthew began going to Cheryll's apartment, his behavior changed.  He began acting out sexually. He wet his bed, and he would vomit the night before he went to the babysitter.  Daniel estimated the behavior problems and vomiting went on for three to four months.  The vomiting ceased shortly after Cheryll began baby-sitting Matthew at the Hendricks home.  Daniel never saw Richard Lee at Cheryll's apartment, but Daniel had been there on only two occasions.

Daniel testified he went to school with Robert Nachand, and Robert does not resemble Richard.  Daniel said the incidents involving Nachand were over a period of time.  Matthew had first disclosed the incidents involving Robert in March 1994.  Daniel also testified, in front of the jury, that Richard reportedly "was just out on parole."

19- OPINION AND ORDER

On re-cross examination, Daniel testified that Matthew said he performed oral sex on Richard twice, and was sodomized twice by Richard.  Daniel reiterated his understanding that Richard and Robert were together when they had sexual contact with Matthew -- "both at the same time."  Defense counsel then asked Daniel:

> Q:   I just want to -- by sodomized, are you referring to
>      anal sex?
>
> A:   Yes, I am.
>
> Q:   Anal intercourse?
>
> A:   Yes.

The prosecution then clarified that Matthew had not used those terms.  Rather, Daniel testified, Matthew "said he'd had something put up inside of him [by Richard], and it hurt."

Defense counsel completed its case by having Richard display to the jury the tattoos on his left arm and right shoulder.  The court also received in evidence a document showing Robert had pled guilty to two counts of sexual abuse.

During closing argument, the prosecution argued the pictures of the dolls, as arranged by Matthew, depict Richard performing fellatio on Matthew and with his "mouth on the butt -- buttocks" of Matthew.  The prosecution further argued that Matthew's mouth was on Richard's genitals, and that Richard touched Matthew's penis with his hand.  The government characterized Robert Nachand as a "scapegoat in this case" and pointed to testimony indicating

Richard Lee had falsely denied knowing what Matthew looked like
or being at Cheryll's apartment when Matthew was present.

Defense counsel called the jury's attention to the guilty
plea by Robert Nachand.  Counsel argued that Richard's tattoos
would be visible with his shirt off, yet Matthew did not mention
any on the person who molested him.  Counsel noted Matthew was
questioned using the Richard and Robert dolls at the same time.
Counsel ridiculed Daniel's testimony -- "it was almost like his
son was in the middle of some type of perverted orgy or something
. . . " and argued that "[c]hildren's reality is often defined by
their parents and by adults," citing Santa Claus and the Easter
Bunny as examples.  Counsel asserted that Matthew "was sitting
there with his fingers crossed when he was asked about telling
the truth and what happened."  Finally, counsel reminded the jury
that an element of the sex abuse charges is that the touching
must have been for purposes of sexual arousal or gratification.

The jury found Richard Lee guilty on all counts.  The
verdict was unanimous on Count 4 (touching Matthew's buttocks).
Eleven jurors voted guilty on the other three counts, enough to
convict in Oregon.  Richard Lee was sentenced to 170 months in
prison: consecutive 110 and 60 month sentences on the sodomy
counts, and 24 month sentences for each count of sexual abuse, to
be served concurrently, plus a 130 month term of post-prison
supervision.  At sentencing the prosecutor acknowledged the trial

testimony did not establish whether the various acts of molestation occurred on a single occasion, or separately.

Richard Lee's trial attorney provided appellate counsel with a list of issues for appeal. Lee's appellate counsel filed a Balfour brief with the Oregon Court of Appeals. State v. Balfour, 311 Or. 434, 451-52 (1991) (articulating procedure to be followed by appellate counsel in a criminal case who concludes there are no meritorious issues for appeal, and that any arguments the client seeks to raise are frivolous).

The Oregon Court of Appeals affirmed Lee's conviction, without opinion, on September 30, 1996. No petition for review by the Oregon Supreme Court was filed.

On February 23, 1998, Richard Lee petitioned for state post-conviction relief. The state trial court denied the petition, adopting the eight page findings of fact and conclusions of law submitted by the State. The Oregon Court of Appeals affirmed without opinion. The Oregon Supreme Court denied review on September 24, 2001.

Lee filed this habeas petition on February 26, 2002. A Magistrate Judge *sua sponte* dismissed the petition as time-barred. On appeal, the State conceded error as to the theory on which the Magistrate Judge had relied. The State asserted an alternate basis for untimeliness, which the Ninth Circuit

/ / / /

declined to address at that time.  The Circuit reversed the
dismissal, and remanded to this court.

After receiving the Report and Recommendation, I held an
evidentiary hearing, heard several rounds of oral argument, and
received additional briefing.

## **Discussion**

### I.   **Equitable Tolling**

Under Oregon law, the petition for post-conviction relief
must be filed within two years after the judgment becomes final.
O.R.S. § 138.510(3).  A federal habeas petition must be brought
within one year from the date the judgment becomes final.[2]
 28 U.S.C. § 2244(d)(1).  The petitioner must exhaust state post-
conviction remedies before proceeding with a federal petition.

Lee filed his petition for state post-conviction relief 511
days after the judgment became final, well within the two years
allowed by state law.  Lee filed his federal petition 135 days
following the denial of his state post-conviction appeals.  This
might seem to be safely within the one year allowed by federal
law.  However, the federal limitations period runs from when the
underlying judgment became final, not the post-conviction
judgment.  The federal limitations period is tolled during direct
appeal and while state post-conviction relief is pending, Nino v.

---

2   The rules contain various nuances, but it is not necessary
to discuss all permutations to decide this case.

Galaza, 183 F.3d 1003, 1006-7 (9th Cir. 1999), but not the interval between the two.  The 511 days before Lee sought state post-conviction relief are added to the 135 days before Lee commenced his federal habeas petition.  The federal petition is thus untimely.[3]

## II.  Actual Innocence

Magistrate Judge Clarke correctly concluded a showing of actual innocence tolls the limitation period and establishes a gateway through which Lee may gain review of the merits of his claim of constitutional error.  To pass through that gateway, Lee must show that in light of all the evidence "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  Schlup, 513 U.S. at 327.  See also id. at 328 ("the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence") (footnote omitted).

/ / / /

---

3  Lee contends the interaction of these limitations periods lures Oregon inmates into a "trap" if they follow what seems the proper procedure.  Petitioners essentially must ignore the limitations period established by Oregon law and anticipate a federal post-conviction petition that may never need to be filed. Lee urges the court to deem his petition timely under the "equitable tolling" doctrine.  In Ferguson v. Palmateer, 321 F.3d 820 (9th Cir. 2003), a Ninth Circuit panel rejected an argument based on the "Suspension of the Writ" clause.  I do not decide whether Ferguson is controlling here, as Lee advances an alternative basis to reach the merits.

"Because a <u>Schlup</u> claim involves evidence the trial jury did
not have before it, the inquiry requires the federal court to
assess how reasonable jurors would react to the overall, newly
supplemented record." <u>House v. Bell</u>, 547 U.S. 518, 538 (2006).
The court is not bound by the rules of admissibility, but must
consider "all the evidence, including that alleged to have been
illegally admitted (but with due regard for the unreliability of
it) and evidence tenably claimed to have been wrongly excluded or
to have come available only after the trial." <u>Schlup</u>, 513 U.S.
at 327.

Although <u>Schlup</u> "requires a substantial showing, it is by no
means equivalent to the standard of <u>Jackson v. Virginia</u>, 443 U.S.
307 (1979) . . . that governs review of claims of insufficient
evidence." <u>Schlup</u>, 513 U.S. at 330.

> First, under <u>Jackson</u>, the assessment of the
> credibility of witnesses is generally beyond the
> scope of review.  In contrast, under the gateway
> standard we describe today, the newly presented
> evidence may indeed call into question the
> credibility of the witnesses presented at trial.
> In such a case, the habeas court may have to make
> some credibility assessments.  Second, and more
> fundamentally, the focus of the inquiry is
> different . . . . Under <u>Jackson</u>, the use of the
> word "could" focuses the inquiry on the power of
> the trier of fact to reach its conclusion.  Under
> [the actual innocence standard adopted in <u>Schlup</u>]
> the use of the word "would" focuses the inquiry on
> the likely behavior of the trier of fact.

<u>Id.</u>

As a threshold matter, Lee also must "support his allegations of constitutional error with new reliable evidence -whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." Id. at 324.  "New" evidence does not necessarily mean newly discovered evidence.  Also included is evidence available but not presented at trial, Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003), or improperly excluded at trial.  See Sistrunk v. Armenakis, 292 F.3d 669, 673, n.4 (9th Cir. 2002) (en banc) (characterizing "previously excluded evidence" as "newly presented").  Whether an item constitutes reliable new evidence must be viewed in the context of the evidence as a whole.

**A.   Evaluation of Reliable New Evidence**

The new evidence here consists of (1) expert testimony by Maggie Bruck on reliability of child witnesses, how interviewing techniques may affect reliability, and her expert evaluation of the procedures utilized in questioning Matthew, (2) extensive information about Robert Nachand's molestation of Matthew and other children, including a police report stating in detail what Matthew told Detective Carter in March 1994 and the circumstances when Matthew first told his mother about being molested, (3) additional details about the police investigation of Richard Lee, (4) information about Larry Lee, including photographs, whether

he had tattoos, his molestation of a child, and whether Larry Lee

had access to Matthew at certain times, and (5) an affidavit from

Cheryll Lewis.  Respondent offers additional evidence in

response.

The first three categories of new evidence are the most

important.  The trial testimony by five-year old Matthew

contained significant ambiguities.  These were not Matthew's

fault.  Many questions the prosecutor posed to Matthew were

phrased in terms of "he" or "his" such as "did he ever touch you"

or "what he did."  Matthew allegedly was molested by two men at

the same location, during the same time period.  Robert was there

in the apartment each time Cheryll left the children with

Richard.

At trial, when Matthew gave seemingly inconsistent answers

regarding whether it was Robert or Richard who did something,

that may reflect the ambiguity of the questions.  Matthew also

was asked ambiguous questions regarding photographs of dolls and

a drawing he made in court.  In addition, the record leaves open

the possibility Matthew inadvertently (on his part) was coached

during a break in his testimony.

The confusion was compounded by the erroneous O.R.E. 412

pretrial ruling, which improperly excluded evidence essential to

the defense and, indeed, essential for the jury to have any real

understanding of what had transpired.

27- OPINION AND ORDER

> The principal purpose of ORE 412 is to protect
> victims of sexual crimes from the degrading and
> embarrassing disclosure of intimate details about
> their private lives . . . . It does not do so,
> however, by sacrificing any constitutional right
> possessed by the defendant.  The rule balances the
> interest of the victim of a sexual crime in
> protecting a private life from unwarranted public
> disclosure, and the defendant's interest in being
> able to present adequately a defense by offering
> relevant and probative evidence.

O.R.E. 412, 1981 Conference Committee Summary.

Evidence regarding Robert was not evidence of promiscuity by Matthew, or offered to show Matthew's character or reputation or propensity to engage in sexual conduct, nor was this evidence intended to embarrass him.  This evidence also fell squarely within the "otherwise constitutionally required to be admitted" exception.

Such evidence was crucial to the defense for many reasons, *e.g.,* to explain how a five year old was familiar with these sexual acts, to provide an alternative explanation for Matthew's abrupt change of behavior, and to probe Matthew's recollection regarding who molested him, when and how often, and what specific acts were performed by each actor.  Cf. LaJoie v. Thompson, 217 F.3d 663, 671, 673 (9th Cir. 2000).  It was imperative that defense counsel be permitted to inquire into Matthew's spontaneous report of molestation by Robert, and the details

Matthew had provided regarding those events.  Cross-examination also would have explored that Matthew never mentioned molestation by Richard when providing Detective Carter a detailed account of very similar conduct involving Robert, at Cheryll's apartment, within the same time period.

The jury eventually heard some evidence regarding Robert Nachand.  By then it was too late for the defense effectively to cross-examine Matthew.  In addition, Detective Fowler testified he lacked personal knowledge of the details of the allegations against Robert.  The defense apparently was unprepared to offer those details through other witnesses, the court having already excluded such evidence.

The testimony of Detective Fowler was affected significantly by the O.R.E. 412 ruling.  Fowler seems to have questioned Matthew about Richard and Robert simultaneously, and asked Matthew compound questions.  The jury did not realize this during much of Fowler's testimony.

The state trial court (and Respondent) believed the alleged confusion issue concerned only whether Matthew could distinguish Richard from Robert.  Actually, the real root of the confusion may be whether Fowler and Daniel carefully distinguished between Robert and Richard in the questions posed to Matthew, in manipulating dolls, and in interpreting Matthew's statements and responses.  The evidence against Richard, especially on the

sodomy charges, consisted almost entirely of hearsay statements
Matthew allegedly made outside the presence of the jury.

The full extent of that confusion is not easily
ascertainable, as Fowler did not record his interview with
Matthew.[4]  On several key points, Matthew's trial testimony about
what Richard did, or did not do, differed from Fowler's
understanding of what Matthew said or demonstrated with the
dolls.  Fowler and Daniel Hendricks were present at the
interview.  Each emerged with a different understanding of what
Richard allegedly did with Matthew and whether Robert
participated.

The testimony of Maggie Bruck is helpful to the court, and
would have been very helpful to a jury, in evaluating the
interview process and Matthew's trial testimony.  Fowler's use of
anatomically correct dolls, exposing the genitals to Matthew, and
other suggestive interviewing techniques--coupled with the
intermingling of Robert and Richard--cast serious doubt upon the
reliability of the information obtained from Matthew on those
occasions.  A fully informed jury could not have too much
confidence in the results of that process.  That does not mean it
categorically is improper to use anatomically correct dolls or

---

4    The testimony of Detective Fowler, both pretrial and at
trial, uses terminology that suggests less than complete
objectivity.

other interview techniques.  Each case must be evaluated on its facts.[5]

   B.   **Counts One and Four -- Sexual Abuse**

   Lee was convicted on two counts of sexual abuse, for touching Matthew's penis and "bottom."  A juror could find, beyond a reasonable doubt, that Richard touched Matthew's penis with his hand.  At trial, Matthew testified Richard did this, and Matthew circled the penis on a drawing depicting himself. Cheryll testified Matthew mentioned a touching two days after he and his sisters were left briefly in Richard's care.  Matthew told Detective Fowler about this touching before Fowler displayed the dolls.

   Matthew's conversation with Cheryll occurred months before Matthew discussed this incident with his father and Detective Fowler.  This reduces the likelihood that Matthew's statement to Cheryll was tainted by a faulty interview process or suggestions from Matthew's father.  With respect to this incident, it also minimizes the likelihood Matthew could have confused Richard Lee with Larry Lee (a convicted child molester), or with anything Robert had done--at least as to the fact a touching somehow occurred.

---

   5  Respondent argues that a "duel of experts" is not a proper basis for showing actual innocence.  That misapprehends the nature of the expert testimony here.  Moreover, Schlup permits (and often requires) a court to evaluate the evidence.

31- OPINION AND ORDER

That a touching occurred is, by itself, not sufficient to establish guilt.  An essential element of the crime charged, that also must be proven beyond a reasonable doubt, is that the touching was intentional and for purposes of sexual arousal or gratification.  Direct proof of intent is not necessary, but intent may not simply be assumed either.

At trial, the prosecution elicited no details from Matthew regarding the incident.[6]  Matthew did not explain the circumstances under which Richard touched him, or how Matthew came to be naked.  Matthew was not asked whether the touching was momentary or prolonged, deliberate or inadvertent, or any other details about the touching.  Matthew was not asked what Richard said or did at the time, or what Matthew said or did in response. The prosecution never asked Matthew about the "wrestling" explanation.

Detective Carter's police report (which the jury never saw) reveals that Matthew provided many details about his molestation by Robert.  This contrasts sharply with Matthew's testimony about molestation by Richard.  Detective Fowler's report and testimony

---

6  Respondent proposes to offer testimony from Matthew, now an adult.  Given the manner in which memories are formed and recalled, it would be difficult to determine what Matthew actually recalls about events when he was four, versus what was told to him over the years or suggested by others or by a faulty interview process.  No forensic evidence has been identified that could corroborate such testimony.

do not adequately address the details either, being largely conclusory and conflating Robert and Richard.

The prosecution never asked Cheryll whether Matthew had been clothed when she left, or when she returned from the store, or if Matthew ordinarily was clothed when Richard was around.  Nor was that information provided in Detective Fowler's report of his interview with Cheryll, or in his trial testimony.

Respondent contends Matthew told Cheryll that Richard "molested" him.  Fowler's police report and transcript of her statement to Fowler reveal that Cheryll quoted Matthew as saying only that Richard "touched his pee-pee."  That touching could have been clothed or unclothed, purposeful or inadvertent. Further allegations did not surface until much later, after Matthew was prompted by his father and Detective Fowler.

The record does not reveal the manner in which Matthew told Cheryl about this touching, *e.g.,* whether it was a matter-of-fact statement or if Matthew was crying or seemed frightened or upset. Again, the prosecution simply never asked, nor is it covered in the transcript of what Cheryll told Fowler or in his report.

Respondent cites Richard's statement "it must have happened while wrestling" as an admission he molested Matthew and lied about it.  Respondent reads too much into that statement. Furthermore, Respondent points to no place in the record where Matthew denied he and Richard were wrestling when the touching

occurred.  It does not appear Matthew was ever asked.  Richard did falsely deny being around the Hendricks children, though that could have been because he knew it was a parole violation.

Ultimately, there is insufficient evidence that the touching was done intentionally and for the purpose of sexual gratification or arousal.

The evidence is even weaker on the charge that Richard intentionally touched Matthew's buttocks with his hand, for purposes of sexual arousal or gratification.  Matthew did not mention this touching to Cheryll, or at least she did not recall it.  Nor does it appear to be among the things Matthew originally related to Detective Fowler, prior to questioning with the dolls.

At trial, Matthew testified that Richard touched his buttocks with one hand, and he depicted it on a drawing.  As with the penis touching, the prosecution never elicited further information.  Matthew was not asked, and did not tell the jury, whether the touching was intentional or inadvertent, momentary or prolonged, a massage or glancing, or what Richard said or did or any other details regarding the incident.

The prosecution's closing argument confused matters by arguing that Richard kissed Matthew's buttocks.  Matthew was not asked that precise question at trial, but he did deny that Richard touched Matthew's buttocks with anything other than a hand.  The hearsay testimony of Officer Fowler, and his posed

doll pictures, were the only source for the assertion that
Richard kissed Matthews' buttocks.

Fowler's hearsay account had Matthew saying Richard touched
Matthew's buttocks with his penis, a cup, and an unknown toy.  At
trial, Matthew denied Richard touched him with anything except a
hand, and denied seeing Richard's penis.  Fowler's hearsay
account had Richard's pants off, but Matthew testified that
Richard--or was it Robert--had his pants on.  Daniel's hearsay
account had Richard performing anal intercourse or digital
penetration, contrary to the testimony of Matthew and Fowler.

On this record, we can speculate that something may have
happened, but it would be little more than speculation.
Accordingly, on this record, it is more likely than not that any
reasonable juror would conclude these charges have not been
proven beyond a reasonable doubt.

   **C.**   **Counts Two and Three -- Sodomy**

The evidence in support of the sodomy convictions is weaker
still.  Notwithstanding the trial testimony by Matthew's father,
the prosecution does not contend Richard had anal intercourse
with Matthew.  Nor, on this record, would any reasonable juror
find that such conduct has been proven beyond a reasonable doubt.

Instead, the prosecution contends Matthew had oral contact
with Richard's penis, and vice versa.  The jury did not hear
about the detailed account Matthew gave Detective Carver, on

March 14, 1994, regarding the molestation by Robert.  Matthew

told Detective Carter "Robert pulls my pants down first and

kisses my pee pee.  Then I unzip his pants and pull them down and

kiss his pee pee.  Robert tells me to bite his pee pee softly.

He kisses my pee pee softly too."  Matthew gave many other

details regarding what Robert did to him, whether Robert's penis

was erect, and if Robert was sitting or standing.

Matthew was capable of communicating such events to the

jury.  At trial, Matthew testified Richard touched his penis and

bottom, but only with a hand.  Matthew denied Richard touched his

penis with anything else.  Matthew testified Richard's pants were

on.  Matthew did not see any part of Richard's body other than

his stomach.  Matthew was shown an anatomically correct drawing

of a man.  Matthew testified he did not see anything on that

drawing, on Richard.  Matthew did not say he told Cheryll about

mouth-to-genital contact with Richard, nor did she recount any

conversation about that.  Matthew did not mention Richard when he

told his mother about Robert molesting him, or when Matthew gave

a detailed description to Detective Carter.

At trial, Matthew identified some pictures of the positioned

dolls, but could not or would describe what was depicted in those

pictures.  He did say, "I'm showing them what they were doing"

and that a picture was "[m]e showing Detective Fowler with the --

what he was doing."  It is unclear who "they" meant.  The "he"

variously was identified as Richard or Robert.  The prosecutor never confronted Matthew about the apparent inconsistency between the pictures and his trial testimony.

In an effort to dispel some confusion, the prosecutor had Matthew identify Richard seated at the defense table, and asked "is this the person that did those things that you've drawn for us today."  Matthew responded affirmatively.  What Matthew "had drawn for us today" was when he circled the two places Richard touched with a hand ("pee-pee" and "bottom").  This clarification did not illuminate whether other testimony and conduct involved Richard, Robert, or both.  Detective Fowler's testimony does little to dispel the confusion.  Maggie Bruck's testimony also would help persuade jurors that there is not proof beyond a reasonable doubt regarding the sodomy charges.

 "Proof beyond a reasonable doubt is proof that leaves you firmly convinced that the defendant is guilty."  Ninth Circuit Model Jury Instruction 3.5 (2008).  The record is insufficient to establish with a sufficient degree of certainty whether Richard did, or did not, sodomize Matthew.  In this circumstance, "it is more likely than not that no reasonable juror . . . would lack reasonable doubt."  House, 547 U.S. at 554.

## III. Constitutional Claims

The Schlup actual innocence standard is only a gateway that allows this court to consider Richard Lee's constitutional

claims.  This court has the benefit of critical evidence not known to the state post-conviction trial court.  That court's evaluation of the ineffective assistance claim was framed by its perception of what evidence was available, the very limited arguments presented, and the mistaken belief no Confrontation Clause or other constitutional violation had occurred.

Having determined that any procedural default or delay is excused, it would be illogical then to refuse to consider the entire record in evaluating the constitutional claims. Accordingly, the AEDPA's usual deferential standard for reviewing state court findings is inapposite, at least when the reliable new evidence casts doubt upon those findings.[7]  Moreover, the state court's assessments of whether Lee had tenable arguments for appeal, and the performance of trial counsel, were premised upon a less complete record than is now before this court, and upon some assumptions now known to be incorrect.  Certain rulings also were contrary to, or an unreasonable application of, clearly established Federal law as determined by the Supreme Court.

/ / / /

_____

    7  The Ninth Circuit has acknowledged, but not yet resolved, tension between the "more likely than not" standard announced in Schlup and the "clear and convincing" standard in 28 U.S.C. § 2254(e)(2)(B), Jamarillo v. Stewart, 340 F.3d 877, 881-82 (9th Cir. 2003), and tension between the "could not have been previously discovered" standard in § 2254(e)(2)(A)(ii) and the standard stated in Sistrunk, 292 F.3d at 673 (en banc).

A.  <u>Ineffective Assistance of Counsel (Sixth Amendment)</u>

A claim of ineffective assistance of counsel requires a showing that counsel's representation fell below an objective standard of reasonableness, and a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  <u>Cooper-Smith v. Palmateer</u>, 397 F.3d 1236, 1243 (9th Cir. 2005).  Reasonable probability is a lower standard of proof than a preponderance of the evidence. <u>Id.</u>  To prevail on his claim for ineffective assistance of appellate counsel, Lee must show (1) his counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them, and (2) a reasonable probability that, but for this, Lee would have prevailed on his appeal.  <u>See</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285 (2000).

Lee's appellate counsel made no argument for his client, not even the arguments identified by trial counsel.  The O.R.E. 412 ruling, and the way that ruling severely constrained examination of witnesses and the evidence heard by the jury, was an obvious issue for appeal.  Certainly the argument was not frivolous.[8]

---

8  Respondent reasons that appellate counsel is not required to "raise on appeal every colorable or nonfrivolous issue" and that "'winnowing out weaker claims on appeal and focusing on' those more likely to prevail . . . is the hallmark of effective appellate advocacy."  <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986). Lee's appellate counsel did not abandon weaker arguments to focus on those more likely to prevail.  He made no argument at all.
(continued on next page)

That some evidence about Nachand came in later is not enough.  Trial counsel's entire case strategy was irrevocably altered by the pretrial ruling.  During opening statement, Lee's counsel could not mention the strongest evidence for the defense or even the defendant's intended theory of the case.

Trial counsel also was prevented from effectively cross-examining Matthew.  "Confrontation means more than being allowed to confront the witness physically." Davis v. Alaska, 415 U.S. 308, 315 (1974).  "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." Davis, 415 U.S. at 315-16; Delaware v. Van Arsdall, 475 U.S. 673, 678 (1986).  This "ensure[s] the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." Maryland v. Craig, 497 U.S. 836, 845 (1990).

The jury never knew of the detailed statements Matthew previously gave about abuse by Robert.  Matthew could not be cross-examined about those statements and events.  Nor could

(continued from preceding page)
 Knowles v. Mirzayance, 556 U.S. ___, No. 07-1315 (March 24, 2009), is distinguishable.  Trial counsel in Mirzayance "merely recommended the withdrawal of what he reasonably believed was a claim doomed to fail."  Slip Op. at 12.  Counsel in Mirzayance "did not give up 'the only defense available.'"  Id. at 14. Mirzayance also did not show a reasonable probability the result of the proceeding would have been different.  Id. at 15-16.

trial counsel effectively explore the Richard versus Robert confusion, or what Matthew recalled telling his parents and Detective Fowler about what each man did to him and when.  These constraints also impeded cross-examination of Fowler.

Respondent argues that experienced trial counsel would not try to elicit these matters from Matthew "when the same testimony was easily elicited from the detectives investigating both cases."  Sur-Reply to Petitioner's Supplemental Memorandum, p. 2. The premise is flawed.  The pretrial ruling forbid defense counsel even to inquire about those topics.  When the trial court belatedly indicated willingness to let some evidence in regarding Matthew account of abuse by Robert, Fowler denied personal knowledge.  It was too late to summon another witness to testify about those events.  Furthermore, cross-examining Detective Fowler regarding the hearsay account in his official report is no substitute for cross-examining Matthew himself regarding these events.  Detective Fowler had no personal knowledge of anything Richard or Robert did to Matthew.

It is daunting enough to defend a child molestation case with horrific allegations, a young boy as victim and witness, and a police detective armed with hearsay as the other star witness. The O.R.E. 412 ruling prevented counsel from presenting a meaningful defense.  "On these facts it seems clear . . . that to make any such inquiry effective, defense counsel should have been

permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." <u>Davis</u>, 415 U.S. at 318.

Richard Lee was effectively deprived of his Sixth Amendment right to confront the witnesses against him, and of his constitutional right to present a theory of defense.   See <u>LaJoie</u>, 217 F.3d 663; <u>Davis</u>, 415 U.S. at 317 ("the jurors were entitled to have the benefit of the defense theory before them").[9]

Lee's appellate counsel was deficient in not asserting this argument.   <u>See</u> <u>Delgado v. Lewis</u>, 223 F.3d 976, 980 (9th Cir. 2000).   As in <u>Delgado</u>, "[t]he appellate issues in this case would seem self-evident."   <u>Id.</u>

To be sure, at the O.R.E. 412 hearing, trial counsel did a poor job of articulating the significance of this evidence.   The

---

9   <u>Cf.</u> <u>Walters v. McCormick</u>, 122 F.3d 1172, 1177 (9th Cir. 1997):

> The State presented the testimony of a physician that abuse had occurred within several hours of her examination of K.C.   Walters offered no evidence to rebut that testimony, and he did not and does not now contend that K.C. had contact with her maternal grandfather on that night. "Evidence of third-party culpability is not admissible '... [unless it is] coupled with substantial evidence tending to directly connect that person with the actual commission of the offense.' "

trial court appears to have thought the issue was simply whether Matthew knew Richard from Robert if he saw them.  In that regard, Lee's trial counsel initially was ineffective in developing and arguing the defense theory.

This also highlights why trial counsel was deficient in not consulting an expert to prepare for the O.R.E. 412 hearing and for trial, and not presenting expert testimony at that hearing and at trial, such as that offered now by Maggie Bruck.  Expert testimony is not required in every criminal case, or even in the majority of cases.  Counsel must exercise reasoned judgment. There is no indication that counsel did exercise informed judgment here, or even consider the possibility of retaining an expert.  This case cried out for expert testimony and advice. Cf. Duncan v. Ornoski, 528 F.3d 1222, 1234-39 (9th Cir. 2008) (counsel ineffective by failing to consult expert on blood evidence, so counsel could make informed trial decisions and present testimony casting doubt on prosecution's theory of case).

Counsel somehow had to offer a credible explanation to negate the testimony by Fowler regarding the dolls, and what Fowler said Matthew told him during the interview.  The severity of the penalties for conviction also weighed in favor of devoting adequate resources to Lee's defense, including consultation with an expert and quite possibly expert testimony at the pretrial hearing and at trial.

Instead, trial counsel called Matthew's father as his lone witness.  It is unclear what counsel hoped to accomplish that outweighed the damage almost certain to be inflicted.  Respondent asserts it was a reasonable trial strategy, and that Daniel's hearsay testimony about Richard having anal intercourse with and orally sodomizing four year old Matthew "provided no new favorable evidence for the prosecution" and in fact benefitted the defense.  Response to Petitioner's Supplemental Memorandum, p. 27.  The court is well versed in trial strategy.  This was not trial strategy.  It was a blunder.  Cf. Sager v. Maass, 907 F. Supp. 1412, 1419 (D. Or. 1995) (defense counsel's introduction of entire victim impact statement into evidence was a "blunder . . . [that] fatally tainted the trial.")

Counsel's decisions must be evaluated without the benefit of hindsight, Strickland v. Washington, 466 U.S. 668, 684 (1984), but hindsight was not required to realize that little good could come from calling Matthew's father as a defense witness, let alone as the only defense witness.  Trial counsel's failure to consult an expert also meant counsel was ill-equipped to conduct an effective examination of Daniel Hendricks, or even intelligently to evaluate the potential risks and benefits of calling the father as a witness.

These were not the only significant errors at trial.  The jury was told--not once, but twice--that Richard Lee was on

parole at the time of these offenses.  Nothing in this record
indicates that trial counsel made a motion in limine to exclude
such testimony, or sought a mistrial or new trial based upon
those highly prejudicial statements.

Furthermore, the most prejudicial evidence, on the most
serious charges, were hearsay statements about what Matthew
allegedly said to Fowler and to his father, or had demonstrated
with the dolls (which amounts to an out of court statement
offered for the truth of what had been depicted).  The trial
court made no finding that these statements bore indicia of
reliability, as required by Supreme Court precedent at the time
of trial.  See Ohio v. Roberts, 448 U.S. 56, 66 (1980).

The statements, if made by Matthew, appear to have been
elicited under very suggestive circumstances, long after the
alleged events.  Fowler made a deliberate choice not to record
the interview.  Cf. Idaho v. Wright, 497 U.S. 805 (1990).[10]  As

_____

10  Though not directly on point, it is worth comparing the
circumstances here and in Walters, 122 F.3d at 1176:

> K.C. had described Walters's acts in graphic detail
> immediately after the events occurred. [FN3]  That
> description was delivered to three persons including
> the defendant's wife, whom no one has suggested had a
> motive to coach the child or to misrepresent what she
> said.  K.C.'s testimony, which had already been
> videotaped prior to the competency determination,
> comported with her initial description of the event.  A
> physical examination of K.C. immediately following the

Respondent acknowledges, Lee's trial counsel never objected to admission of these hearsay statements.  Response to Petitioner's Supplemental Memorandum, p. 30.

It might be argued that indicia of reliability were not necessary, as Matthew testified at trial.  The trial transcript shows Matthew was capable of answering the questions to him, but he could still be confused by ambiguous or poorly worded questions.  Many questions posed to Matthew at trial were ambiguous or poorly worded.

In addition, the hearsay allegations were presented only after Matthew testified and departed.  No good defense attorney would recall him to the stand.  Matthew effectively was unavailable for cross-examination at that point.  See Lowery v. Collins, 988 F.2d 1364, 1368-71 (5th Cir. 1993) (applying extant Supreme Court precedent).  This is not a situation in which a witness testifies and denies having made a statement, or testifies he cannot recall the statement.

At trial, the prosecution made little effort to elicit testimony directly from Matthew regarding the matters alleged in

event provided expert medical testimony corroborating the fact of abuse.

FN3. The detail included a description of a physical event-a penis growing erect-that, although related in the language of a three-year-old, was both externally accurate and impossible for K.C. to have fabricated.

the indictment.  Instead--particularly as to the sodomy counts--
the prosecution relied exclusively on hearsay statements lent a
voice of authority by a police detective.

"If the declarant is available and the same information can
be presented to the trier of fact in the form of live testimony,
with full cross-examination and the opportunity to view the
demeanor of the declarant, there is little justification for
relying on the weaker version." United States v. Inadi, 475 U.S.
387, 394 (1986).  In Inadi, the Court concluded that statements
made by a co-conspirator while the conspiracy is in progress
"provide evidence of the conspiracy's context that cannot be
replicated, even if the declarant testifies to the same matters
in court." Id. at 395.  By contrast, there is no obvious reason
why Matthew could not tell the jury what Richard and Robert each
did, or did not, do to him, or perhaps even show the jury using
dolls in open court.  Some finesse would be necessary to elicit
this testimony without unduly leading questions, but the jury
would have heard the questions posed to Matthew and his
responses, and could make its own assessment.

There is a reasonable probability that, but for the
deficient performance of trial and appellate counsel, Lee at
least would have received a new trial based on the violations of
the Confrontation Clause and the other errors at trial.  Had
trial counsel consulted an expert, he also would have been better

prepared to argue the pretrial motion, and to establish a solid foundation for renewing that argument on appeal.

Lee has established his claim for constitutionally ineffective assistance of counsel.  He is entitled to a new trial on all counts.

**B.    Insufficiency of the Evidence (Jackson)**

Lee also argues that the evidence at trial was insufficient to convict him under the standard established in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  The <u>Jackson</u> standard is more demanding than the <u>Schlup</u> standard.  Whether the State should retry Lee after this many years is a different question than whether the State legally may.

**Conclusion**

The Amended Petition (# 37) for Writ of Habeas Corpus is granted.  The four count Judgment of Conviction and Sentence entered against Richard Lee on June 29, 1995, in Linn County, Oregon, is vacated.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

Within 120 days following entry of judgment, excepting such delays as are otherwise excludable under any applicable speedy trial laws, the State of Oregon must retry Richard Lee or release him from custody.  Whether Lee remains in custody pending a retrial shall be determined by Oregon courts in accordance with the laws of that state.

IT IS SO ORDERED.

DATED this 24th day of March, 2009.


/s/ Owen M. Panner

_____
OWEN M. PANNER
UNITED STATES DISTRICT JUDGE